Angelo ANOBILE, Joseph Omboni, Jr., Michael Forte, Wardell Washington, Richard W. Fulfree, George P. Fulfree, and Robert Rahner, Plaintiffs,

v.

Frank PELLIGRINO, Edward J. Martin, Michael Hoblock, Bennett Liebman, Joseph Neglia, Joel Leveson, and The New York State Racing and Wagering Board, Defendants.

No. 97 Civ. 9512(BDP).

United States District Court,
S.D. New York.

Aug. 25, 1999.

Richard W. Fulfree, Yonkers, NY, for plaintiffs.

Michael Kennedy, New York State Attorney General's Office, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARRINGTON D. PARKER, Jr., District Judge.

Plaintiffs, Angelo Anobile, Joseph Omboni, Jr., Michael Forte, Wardell Washington, Richard W. Fulfree, George P. Fulfree, and Robert Rahner, originally commenced this action pursuant to 42 U.S.C. §§ 1983 and 1985 seeking interlocutory relief contending that a December 9, 1997 search of the entire premises of the Yonkers Raceway sanctioned by defendants for the purpose of uncovering unauthorized drugs and drug paraphernalia that might be administered to horses about to race at Yonkers violated plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights guaranteed under the United States Constitution.

The trial on the merits was consolidated with the hearing on the preliminary injunction, and the action was tried to this Court on March 29, 30, and 31, 1999. On March 29, 1999, this Court dismissed on the ground of sovereign immunity plaintiffs' claims for money damages pursuant to 42 U.S.C. § 1983 or § 1985 against the New York State Racing and Wagering Board and its members in their official capacities. On March 31, 1999, the Court dismissed plaintiffs' 42 U.S.C. § 1983 claims against defendants Frank Pelligrino, Edward J. Martin, Michael J. Hoblock, Bennett Liebman, and Joseph P. Neglia, based on qualified immunity grounds. The Court's findings of fact and conclusions of law follow.

### FINDINGS OF FACT

*Parties*

Plaintiff Angelo Anobile is a horse trainer licensed by the New York State Racing and Wagering Board ("RWB" or "the Board"). He has been continuously licensed by the RWB since the late 1960s or early 1970s. On December 9, 1997, plaintiff Joseph Omboni, an owner since the early 1970s, and a trainer for approximately the past ten years held RWB licenses as an owner and a trainer. Plaintiff Michael Forte has been continuously licensed by the RWB as an owner, driver, or trainer from the early 1970s until 1999. Plaintiff Wardell Washington has been continuously licensed by the RWB as a groom for about thirty years. Plaintiff Robert Rahner is presently licensed by the RWB as a trainer and driver. He has been licensed as a trainer and driver since the early 1970s, and was also licensed as an owner around 1987. Subsequently he ceased to be an owner and resumed his license as just a trainer and a driver. Plaintiff Richard Fulfree, Esq., is licensed by the RWB as an owner and trainer. His brother, plaintiff George Fulfree has never been licensed by the RWB.

The RWB is an agency within the New York State Executive Department. Defendant Frank Pelligrino was the presiding

Judge at Yonkers Raceway in December 1997, and continues to function in that capacity. Defendant Edward Martin was the Executive Director of the RWB in December 1997, and continues to serve in that capacity. Defendant Michael Hoblock was the Chairman of the RWB in December 1997, and continues to serve in that capacity. Defendants Bennett Liebman and Joseph Neglia were members of the RWB in December 1997, and continue to serve in that capacity.

*The Search*

Section 301 of New York State's Racing, Pari–Mutuel Wagering and Breeding Law provides, in part:

> b. The state racing and wagering board shall prescribe rules and regulations for effectually preventing the use of improper devices, the administration of drugs or stimulants or other improper acts for the purpose of affecting the speed of harness horses in races in which they are about to participate.

N.Y. Racing, Pari–Mutuel Wagering and Breeding Law, 301(2)(b).

Section 902(1) of the Pari–Mutuel Wagering and Breeding Law provides:

> In order to assure the public's confidence and continue the high degree of integrity in racing at the pari-mutuel betting tracks, equine drug testing at race meetings shall be conducted by a land grant university within this state with a regents approved veterinary college facility. The state racing and wagering board shall promulgate any rules and regulations necessary to implement the provisions of this section, including administrative penalties of loss of purse money, fines, or denial, suspension, or revocation of a license of racing drugged horses.

N.Y. Racing, Pari–Mutuel Wagering and Breeding Law, § 902(1).

Acting under the auspices of New York's Pari–Mutuel Wagering and Breeding Law, the RWB has promulgated a number of regulations to maintain control over racing and its participants. One of its primary concerns has been to prevent the use of performance enhancing drugs on race horses. Section 4120.6 of the New York Code of Rules and Regulations ("NYCRR") prohibits, except when in the possession of a veterinarian, upon the premises of a licensed harness race track:

> (1) any equipment which may be used for hypodermic injection or other infusion into a horse or any vial, bottle, or cartridge designed and usable for such purposes; or
>
> (2) any controlled substance, listed in schedule I through IV of the United States Code, title 21 (Food and Drugs) section 812, or any drug which has not been approved for use in the horse by the Federal Food and Drug Administration. Not included in this prohibition are liniments, antiseptics, ointments, leg paints, washes and other products commonly used in the daily care of horses.

NYCRR, § 4120.6(a).

17. The NYCRR provides:

> (d) Each track is required to use all reasonable efforts to prevent and detect violations of this section. Each track, the board and the judges or their designees shall have the right to enter into or upon the buildings, stables, rooms, motor vehicles or other places within the grounds of such track to examine the same and to inspect and examine the personal property and effects of any person within such places; and every person who has been granted a license by the board, by accepting his license, does consent to such search including a personal search and to the seizure of any drugs or hypodermic syringes, hypodermic needles or other devices and if the board shall find that any person has refused to permit any such search or seizure it may impose such punishment as may be appropriate.
>
> (e) A report shall be made to the Bureau of Narcotics of the Department of the Treasury of the United States of all

cases in which it is reported to the board that narcotics or other controlled substances have been detected in a specimen from any horse; and if any veterinarian or physician has been involved therein, a similar report shall be made to the New York State Education Department.

NYCRR, §§ 4120.6(d) and 4120.6(e).

In order to obtain a New York State Racing License, an applicant is required to sign a form that states, in part:

By the acceptance of a license issued pursuant to this application, I waive my rights to object to any search, within the grounds of a licensed racetrack or racing association, of any premises which I occupy or control or have the right to occupy or control and of my personal property, including a personal search, and the seizure of any article, the possession of which may be forbidden within such grounds.

In order to work on the grounds of the racetrack, or to act as an owner, trainer, driver, or groom, a RWB license was required.

Defendant Joel Leveson began working for the RWB, as a racing investigator, in November 1995. At the time of trial, Leveson was the Acting Director of Investigations, a position that he had held for approximately one month on December 9, 1997. In that capacity, he managed an approximately fifteen person staff, scheduled their work, and generally oversaw compliance issues with the Board.

Prior to the December 9, 1997 search, Leveson had conducted searches of barns on the racetrack premises. In those searches, he found equine drugs and syringes, tubes, funnels, and other equipment used by horsemen to treat horses. Such materials created, in Leveson's words, "a non-level playing field" in which medicated horses performed better than they would otherwise. Leveson also recalled isolated instances in which horses tested positive for cocaine, and occasions when their han-

dlers also tested positive for illegal drugs. As Acting Director, it was his responsibility to ensure that the races at Yonkers Raceway were fair and free of the effects of prohibited substances.

Security at Yonkers Raceway was maintained by a special police force of about thirty members, called peace officers, who had powers similar to those of regular policemen. The police force was employed by the Yonkers Racetrack, and was not employed by the RWB. The Raceway was not routinely patrolled by either Yonkers police officers or any other town or village Police Department.

At some point before the planning of the search, Leveson briefed Michael Hoblock, the RWB Chairman, and various members of the Board on issues of security and other conditions at the Raceway. Some time afterwards, Duke Dranichak, who at the time was Chief of Racing Officials and Second Acting Director of Investigations, ordered Leveson to undertake the December 9, 1997 search. Leveson then planned, formulated, and ultimately directed the search.

Leveson intended to search all areas of the Yonkers Raceway. This decision was based on his conclusions that there were significant compliance problems at the Raceway, and he wanted to determine their extent through what he termed a "compliance audit." The problems included: the common use of equine drugs in the stable and racing areas of the track, use of drugs by people on Raceway property, the presence of unlicenced individuals on the racetrack, security's failure to secure the barns properly or to know who was in the barns, security's absence during off days or at night when there was no racing and gates were unguarded, and the existence of prostitution in the stable and dormitory areas of the racetrack.

Leveson knew that of all the RWB racetracks, Yonkers Raceway had one of the highest number of post-race positive tests for drugs, a result exacerbated, in his

judgment, by the fact that pre-race testing of horses, which he felt enhanced the integrity of racing, had been eliminated. Leveson thus planned to search every barn, dormitory, vehicle, and individual on Raceway property that day. Leveson believed that § 4120 provided the authority under which such a search could be conducted.

Prior to the search, Leveson told Hoblock in general terms what the search would entail; for example, that it would cover the entire racetrack. He also consulted with Robert Feuerstein, counsel to the RWB, about two weeks before conducting the search. Feuerstein, who has been counsel to the RWB since 1992 and reports directly to Hoblock, supervises enforcement of the RWB's rules, and renders legal advice to the staff and RWB. Feuerstein told Leveson that Rule 4120.6 authorized a search of the grounds of the racetrack, and of vehicles and individuals on the grounds, but that significant invasions of personal privacy such as strip-searches were not permitted. He also told Leveson that dormitory searches had been performed before and were allowable. Feuerstein discussed the search briefly with Hoblock, but did not recall discussing the search with anyone else.

In addition to Feuerstein, John Signor, who became Director of Audits and Investigations in late November, and Edward Martin, the Executive Director of the RWB, were aware of the search some time before it occurred.

In preparation for the search, Leveson drafted a memorandum outlining procedures that should be followed. The memorandum covered procedures for searching dormitories, barns, vehicles, and trailers. For searches of dormitories, for example, the memo read:

**DORMITORY SEARCHES**—THE PURPOSE IS TO FIND DRUGS, DRUG PARAPHANALIA (sic) (NEEDLES, SYRINGES, PLASTIC PACKAGES OF MARIJUANA, COCAINE, HEROINE (sic), ETC. PIPES, MIRRORS OR GLASS, STRAWS FOR SNORTING LINES OF COCAINE POWDER, CRACK VIALS, ETC.) AND OTHER POTENTIALLY DANGEROUS ITEMS I.E.: GUNS, LONG KNIVES, SHAVING BLADES, ETC. IF YOU THINK ANY ITEMS ARE DANGEROUS, TAKE SAME AND GIVE THE SUBJECT A RECEIPT. TELL THIS PERSON THEY CAN RETRIEVE SAME, FROM THE TRACK PRESIDING JUDGE. YOU HAVE A GREAT POWER OF DISCRETION IN THIS AREA. IF YOU DO TAKE ONE OF THESE ITEMS, TRY NOT TO GET YOUR PRINTS ON SAME. PLACE THESE ITEMS IN AN EVIDENCE BAG AND SEAL SAME HAVE THE OWNER SIGN THE EVIDENCE LABEL, PUT THE TIME AND DATE ON THE LABEL AS WELL AS THE SUBJECT'S NAME AND WHERE FOUND. WE ARE ALSO LOOKING FOR UNAUTHORIZED PERSONS BEING HARBORED ILLEGALLY IN THE ROOMS. THESE PEOPLE SHOULD BE DEALT WITH THE SAME WAY AS PREVIOUSLY STATED IN THE LICENSE AUDIT SECTION.

There were no provisions for knocking before entering the dormitory rooms, but Leveson felt that because the memorandum directed the searchers to be "polite, cordial, and professional," the searchers would knock before entering the dormitories.

Prior to conducting the search, Leveson submitted a draft copy of his memorandum to Feuerstein. Feuerstein perused the memo, but did not recall discussing it with Leveson or anyone else. Leveson, on the other hand, recalled discussing the draft with Feuerstein. In any event, Leveson understood that Feuerstein had tacitly approved the memorandum. In preparation for the search, Leveson also obtained from the Coxsackie, New York Police Department the services of a drug sniffing dog and a handler, intending to use the dog to

search the dormitory areas. Before the search, Leveson cleared the use of the dog with Feuerstein.

Three weeks to a month before December 9, 1997, Leveson told Dominick Bologna about the planned search. Bologna had been employed as an RWB investigator since December 1982. He is also in charge of the Raceway's alcohol and drug abuse program which identifies and assists individuals involved in racing who may have substance abuse problems. Prior to joining the RWB, Bologna served for twenty years in the New York City Police Department. Under Herman Kluge, the former Deputy Director of Investigations, Licensing and Auditing for RWB and Bologna's supervisor, prior searches had been much more limited than the one planned for December 9, 1997 and had been predicated on information reasonably indicating rules violations or illegal behavior.

Before he agreed to participate in the search, Bologna was satisfied that the search was legal, having been assured that the issues of police participation and the search's scope had been discussed with Feuerstein and Hoblock. Though Bologna did not participate in the planning of the search, he had discussed with Leveson how the search would be carried out, specifically matters concerning the safety and decorum of those conducting the search. Among other things, the two wanted to ensure that the searchers would not be injured by any syringes that they might find, and that the searchers would conduct themselves in an efficient, courteous manner. They discussed searches of dormitories, vehicles, and the barn areas.

Leveson recruited a number of people to help conduct the search. He chose to conduct the searches during the day, when those participating in the races would be at the Raceway, racing or working with their horses.

At 6:30 a.m. on the day of the search, Leveson met with the searchers at a restaurant parking lot near the track. At that meeting, Leveson gave each of the investigators a packet that included his memo, evidence bags, tags, seals, and stickers. Leveson then read from the memo and asked for questions. Bologna cautioned the searchers about proper safety and decorum. Leveson paired searchers who had worked at Yonkers with those who had not, in order to maximize the experience level in each group. Leveson asked Jim Gallagher, the Chief of Racing Operations, to contact Frank Pelligrino and explain what was planned for the day.

The searches of the approximately one hundred dormitory rooms lasted until about 11:00 or 11:30 that morning. Some of the dorms were used for living quarters for grooms and other personnel. Leveson chose Dominick Bologna to lead the searches of the dormitories, as Bologna had the greatest understanding of drugs and drug paraphernalia and was the most experienced person on the team. Cisero Pastore, a former New York City police officer, who had served as a racing investigator for the RWB for ten or twelve years, George Carey, a fairly new racing investigator, and Ellen All were also chosen to search the dormitories. The drug-sniffing dog went to each dormitory as well; if the dog alerted, the searchers would perform a more extensive search.

With respect to searches of the barn area, Leveson's memorandum stated:

BARN SEARCHES—THE PURPOSE IS TO FIND NEEDLES, SYRINGES, INJECTION BOTTLES (PLASTIC OR GLASS). THESE HAVE RUBBER TOPS WITH AN ALUMINUM RING AROUND SAME, STOMACH TUBES WITH FUNNELS PRESENT WITH THEM. (NOTE: A FUNNEL ON ITS OWN IS OF NO INTEREST. HOWEVER, IF YOU FIND A FUNNEL, LOOK HARDER FOR THE STOMACH TUBE, WHICH IS USUALLY A CLEAR PLASTIC PIPE A HALF INCH IN DIAMETER AND ABOUT 6 TO 8 FEET LONG.) JUGGING TUBES ARE ALSO OF INTEREST.

THEY ARE RUBBER, ¼ INCH IN DIAMETER ABOUT 1 TO 2 FEET LONG WITH A SILVER METAL END, WHICH WOULD CONNECT TO A NEEDLE. SYRINGES THAT HAVE THEIR TIPS BROKEN OFF OR WHICH HAVE A TAPERED END ARE USED FOR SQUIRTING LIQUID DOWN THE HORSES THROAT. THESE ARE LEGAL. ALL BOTTLES WHICH HAVE PILLS OR LIQUID THEREIN ARE TO BE LABELED WITH THE CONTENTS. IF NOT, THEY MUST BE SEIZED AND RECEIPTED.

The barn area covered roughly a five-acre portion of the racetrack. Searches of that area started around 7:15 or 7:30 that morning, and continued until about 11:30 a.m. or 12:30 p.m.

When alleged contraband was found, the searchers were instructed to put the evidence in bags, seal and tag them. The items were then secured until they were presented to the presiding judge of the racetrack. Once the items were presented to the judge, the person owning them was interviewed and ultimately given a hearing if one was requested.

After lunch, the investigators searched trucks, trailers, and other vehicles entering the racetrack. Those entering the track who did not want their vehicles searched could leave the vehicle in the public parking lot outside the racetrack and walk in, as long as they were prepared to show that they had no contraband with them. If they chose to drive into the racetrack and refused entry to their cars, the searchers would warn them that they could face other penalties.

Bologna accompanied two investigators, the narcotics detecting dog, and the dog's handler in their searches of the dormitories. In addition to the investigators, Bologna was also accompanied by an employee of Yonkers Raceway, who was to assist them in gaining entry to the dormitories by means of pass keys. To ensure corrob-

oration, all the rooms were searched by more than one person.

The investigators first knocked on the door of the dormitories, announcing themselves and their intentions if they received a response. The handler with the dog would briefly scan the room for 15 to 20 seconds, then the inspectors would thoroughly search the room. If the room was unoccupied, the searchers used the pass key to gain entry, and searched the rooms upon entering them. Bologna did not recall being refused entry into a dormitory room.

Although Bologna felt that they had the authority to do personal searches, he did not do them, and was not aware that any of the other searchers did them either. He did not see any of the other investigators touch any of the occupants of the dormitory rooms.

Frank Pelligrino, presiding judge at the Yonkers Raceway who began working as an inspector for the RWB in 1975, became aware of the December 9, 1997 search that morning. Pelligrino, in conjunction with counsel and Leveson, was responsible for meting out punishments and fines for those who were found in violation of the RWB regulations. Pelligrino systematically informed the individuals that if they did not appeal a guilty finding, their penalties would be reduced.

Defendants Michael Hoblock and Edward Martin were aware of the RWB's regulations in December 1997, and were aware both of the search and of its parameters. Neither believed the searches would violate applicable regulations.

*Specific Searches*

All seven plaintiffs were among those searched at Yonkers Raceway on December 9, 1997. All of the licensed plaintiffs had their licenses checked and stickered by inspectors at some point during the search.

On the morning of December 7, 1997, inspectors checked plaintiff Michael Forte's license and searched as he drove

onto raceway grounds. His brother-in-law was a passenger in the car. Later that day investigators thoroughly searched Forte's dormitory room, despite his protests. Investigators made Forte leave the room during the search which lasted for about ten minutes. The investigators allegedly found a plastic bag containing a hypodermic needle and syringes in Forte's room, and as a result of the December 9, 1997 search, Forte's license was suspended. He has appealed the suspension, and his track privileges are in force pending appeal.

Investigators searched plaintiff Angelo Anobile's stall which he rented in a stable, including the trunks where he maintained his possessions. Inspectors also searched two other trunks maintained by Anobile located in a storage area in another section of the barn. Anobile opened those trunks for a female inspector. The inspector showed Anobile a bag that she said she had found in one of his trunks. She asked him to sign a receipt for the bag. He denied that she had found it in his trunk and declined to sign for it, though he showed her his license upon request.

Plaintiff Wardell Washington was staying in a dormitory on the Yonkers Raceway on the morning of December 9, 1997. An inspector with a dog searched Washington's dorm room, including the case under his bed, and went through his clothes. The inspector discovered what was then believed to be a small amount of marijuana. The searchers confiscated Washington's shirt and subsequently required him to take a series of urine tests. Washington subsequently paid about $80 for four urine tests, all of which generated negative results.

Plaintiff Joseph Omboni had two or three horses stabled at the Yonkers Raceway on December 9, 1997. That morning, investigators searched his possessions in the barn in his absence. On his way out of the racetrack that day, his car was searched by inspectors and a dog.

Around 7:30, plaintiff Robert Rahner was returning from taking his horse out on the track, when a man approached him indicating that he was from the RWB. The man checked Rahner's license, placed a sticker on it, and returned it to Rahner. When Rahner returned to the barn between 8:00 and 8:30 after taking his next horse out on the track, he discovered two men going through his equipment and trunks. The search of this area lasted ten to fifteen minutes. One of the men approached him with something wrapped in a plastic bag, and asked Rahner to sign for it. Rahner refused. On his way out of the racetrack, between 11:30 a.m. and 1:00 p.m., Rahner's car was searched. While Rahner at first refused, he eventually consented to the car search.

On December 9, 1997, at around 7:15 a.m., plaintiffs George Fulfree and his brother plaintiff Richard Fulfree attempted to leave the Raceway in Richard's station wagon. They were stopped on their way out by individuals wearing jackets with "NYSRA" on the back, who told them to get out of the vehicle. (Tr. at 268.) Richard Fulfree asked if they had a search warrant, and they replied that they did not need one. Both men were patted down, then the searchers searched the vehicle, placing a sticker on the console between the two front seats for which they had no key.

### CONCLUSIONS OF LAW

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. This Court's jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343.

Plaintiffs assert six claims. The first four allege that the defendants' December 9, 1997 search was unreasonable and violated the plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1985. Plaintiffs' fifth claim alleges that § 4120 of the

RWB's rules is *ultra vires* and vague in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs' sixth claim alleges that the RWB was threatening to use the fruits of their search against some of the plaintiffs, and that the plaintiffs suffered irreparable injury as a result of defending themselves after defendants' search.

*Burford Abstention*

■■■ Defendants contend that this Court should decline jurisdiction on the abstention grounds set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *Burford* abstention "requires federal courts to decline to exercise jurisdiction over cases which involve difficult issues of state law bearing on policy problems of substantial public import." *Williams v. Lambert*, 46 F.3d 1275, 1283 (2d Cir.1995). The *Burford* doctrine requires a federal court to abstain from interfering with the proceedings or orders of state administrative agencies when: (1) there are " 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar' "; or (2) the " 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' " *New Orleans Public Service, Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)).

■■ Abstention, however, is the exception, not the rule, and a number of cases have held that where a state's regulations violate the federal constitution, *Burford* abstention is not required, even if the state has a substantial interest. *Hachamovitch v. DeBuono*, 159 F.3d 687, 698 (2d Cir. 1998) (citing *Alliance of American Insurers v. Cuomo*, 854 F.2d 591, 601 (2d Cir. 1988) ("The state has no right to an uncon-

stitutional policy, coherent or otherwise.")); *Williams*, 46 F.3d at 1283 (*Burford* abstention did not apply where only claim in federal court was one for declaratory judgment under Federal Constitution).

■■ In this case, the plaintiffs seek a declaratory judgment that Rule 4120.6 and the searches performed thereunder violated the Federal Constitution. Resolution of these issues will not require this Court to wrestle with difficult questions of state law, and, while the RWB is charged with maintaining the integrity of harness racing in New York, it has no right to an unconstitutional policy, if the policy is indeed unconstitutional. As such, this Court declines to abstain under *Burford*.

*Claims I through IV*

Plaintiffs contend that the warrantless searches that occurred on the Yonkers Raceway on December 9, 1997 violated the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. *See* 42 U.S.C. §§ 1983 and 1985.

■■■ The Fourth Amendment, of course, guards against unreasonable searches. *Donovan v. Dewey*, 452 U.S. 594, 599, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). Unlike searches of private homes, however, legislative schemes that authorize warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment. *Id.* at 598, 101 S.Ct. 2534. "[W]arrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials." *Id.* at 599, 101 S.Ct. 2534 (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978)). Further, "[w]here Congress has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive

rules apply." *Id.* (quoting *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970)).

There is a well-established exception to the warrant requirement for administrative inspections of pervasively regulated industries, allowing warrantless searches made pursuant to a regulatory scheme. *See, e.g., New York v. Burger,* 482 U.S. 691, 702, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (warrantless inspections of vehicle dismantling businesses authorized by New York vehicle and traffic law); *Donovan v. Dewey,* 452 U.S. 594, 605, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (warrantless inspections of coal mines authorized by Federal Mine Safety and Health Act of 1977); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (warrantless search of gun dealer's locked storeroom authorized by Gun Control Act of 1968); *Blue v. Koren,* 72 F.3d 1075, 1082 (2d Cir.1995) (warrantless inspections of nursing homes conducted by New York Department of Health); *United States v. Chuang,* 897 F.2d 646, 650 (2d Cir.1990) (warrantless searches conducted pursuant to regulatory scheme of banking industry may be reasonable within meaning of the Fourth Amendment). The Supreme Court in *Burger* explained:

> Because the owner or operator of commercial premises in a "closely regulated" industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, ... have lessened application in this context. Rather, we conclude that, as in other situations of "special need," see New Jersey v. T.L.O., 469 U.S. 325, 353, 105 S.Ct. 733, 750, 83 L.Ed.2d 720(1985) (opinion concurring in judgment), where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may

well be reasonable within the meaning of the Fourth Amendment.

482 U.S. at 702, 107 S.Ct. at 2643–44.

Warrantless inspections of pervasively regulated businesses may be allowed if three criteria are met. First, a "substantial" governmental interest must inform the regulatory scheme. Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." *Id.* (quoting *Donovan,* 452 U.S. at 600, 101 S.Ct. 2534). Third, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Id.* at 703, 107 S.Ct. 2636. This means that the regulatory statute must perform a warrant's two basic functions: "it must advise the owner of the commercial premises that a search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* (citing *Marshall,* 436 U.S. at 323, 98 S.Ct. 1816).

Given the high financial stakes associated with the sport, competitive horse racing is necessarily a closely regulated industry. *See LeRoy v. Illinois Racing Board,* 39 F.3d 711, 713 (7th Cir.1994) ("horse racing is a tightly regulated business, a fact that permits searches designed to enforce the terms of the regulatory regime."); *Shoemaker v. Handel,* 795 F.2d 1136, 1141 (3d Cir.1986) (horse racing regulations "have two separate but interrelated purposes: the protection of the wagering public, and the protection of the state's fisc by virtue of the wagering public's confidence in the integrity of the industry."); Note, *Constitutional Law—Search and Seizure—Illinois State Racing Board Rule Which Provides for Warrantless Searches of Racing Licensees is Constitutional as Applied to the Search of a Jockey's Automobile—Leroy v. Illinois Racing Board, 39 F.3d 711 (7th Cir.1994),* 6 Seton Hall J. Sport L. 223, 224 (1996) (describing horse racing regulations in different states). In New York, horse racing is the only sport in

which wagering may be conducted legally. Fans attending races wager millions of dollars daily and the sport generates tens of millions of dollars in revenue annually.

In New York and states around the country, regulations are largely aimed at preventing the illegal use of performance enhancing drugs.[1] *See, e.g.,* Ill.Admin.Code tit. 11, § 1320.10 (1995); N.J.Admin.Code § 13:70–14A.5; Cal.Code regs. tit. 4 § 1858 (1989); Note, *Constitutional Law—Search and Seizure,* Seton Hall J. Sport L. at 227–30 (stating that "[m]edication regulations have existed in most major racing jurisdictions since the 1970s" and that "the abuse of performance enhancing drugs is such a major concern as to require widespread regulation."). State horse racing board regulations provide for the testing of a horse's blood and urine before and after races. In New Jersey, regulations expressly authorize searches of "the premises occupied by the stable involved" after a horse tests positive for prohibited drugs. N.J.Admin.Code S 13:70–14A.5. Illinois' Racing Board Rule 25.19, like the regulation at issue here, requires licensees of the Illinois Board to consent to suspicionless searches. Ill.Admin.Code tit. 11, S 1325.190 (1995).

That other states, including California, Illinois, New Jersey, Kentucky and Maryland, have imposed similarly extensive regulations on horse racing further supports the "closely regulated" status of this industry. *See Burger,* 482 U.S. at 705, 107 S.Ct. 2636 ("That other states besides New York have imposed similarly extensive regulations on [the same industry] further supports the 'closely regulated' status of this industry.")

■ It is therefor undisputed that the first two requirements for warrantless searches are fulfilled. The New York State Legislature has a substantial interest in regulating the racing industry in order to preserve the integrity of, and insure public confidence in, the sport. In addition, warrantless searches to uncover the illegal use of equine drugs are necessary to further the regulatory scheme. *See, e.g., Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979); *Equine Practitioners Assoc. Inc. v. New York State Racing and Wagering Bd.,* 105 A.D.2d 215, 483 N.Y.S.2d 239, 243 (1st Dep't 1984).

The parties' dispute in this case centers on the scope of the regulations enacted under the enabling statute and whether the regulations meet the third requirement of the *Burger* test. This Court finds that the third requirement for warrantless administrative searches of a closely regulated industry—that the regulations provide a constitutionally adequate substitute for a warrant and limit the discretion of the inspecting officers—has been satisfied here. The warrantless search of Yonkers Race Track on December 9, 1997, did not exceed the scope of the RWB regulations. Both the regulations and the search survive constitutional scrutiny.

■ "An administrative agency, as a creature of the Legislature, is clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication." *City of New York v. State of New York Commission on Cable Television,* 47 N.Y.2d 89, 92, 416 N.Y.S.2d 786, 390 N.E.2d 293 (1979) (citations omitted). An administrative agency, however, may not operate outside its lawfully designated sphere. *Id.* Under the enabling statute in question here, the RWB has been granted extensive authority to promulgate regulations to assure that pari-mutuel horse racing is conducted on a "level playing field". It has been granted authority to prevent circumvention and evasion of rules, as well as

---

**1.** A wide variety of performance enhancing drugs are administered to race horses. These include amphetamines, cocaine, and narcotics, which increase speed; and depressants, which decrease speed; pain-deadening anesthetics and anti-bleeding medications such as Lasix. *See* Note, *Constitutional Law—Search and Seizure,* Seton Hall J. Sport L. at 226–27 (describing four categories of drugs used in horses).

prevent the use of improper drugs and prohibited devices that would undermine the integrity of the sport.

The scope of warrantless searches and the discretion of inspecting officers are limited under the RWB's enabling statute and the regulations the Board has promulgated. The enabling statute in question here limits the authority of the RWB to promulgate regulations "for effectually preventing the use of improper devices, the administration of drugs or stimulants or other improper acts for the purpose of affecting the speed of harness horses in races in which they are about to participate." N.Y. Racing, Pari–Mutuel Wagering and Breeding Law, 301(2)(b). Under § 4120.6(d) of the NYCRR, inspecting officers are allowed only to conduct warrantless searches of areas within the grounds of the race track to insure compliance with § 4120.6. As noted above, that Section covers equipment that may be used to inject or infuse substances into a horse and controlled substances or drugs not approved for use in horses.

Searches made pursuant to § 4120.6(d) fall within the established exception to the warrant requirement for administrative inspections in "closely regulated" business. The provisions regulating the activity of harness racing are extensive. Owners, drivers and trainers are required to obtain licenses in order to participate in this industry. Under § 4120.6(c) participants in the industry must label all bottles or other containers kept on the premises of racing associations, indicating their contents and ingredients. Any discovery of narcotics or other controlled substances obtained from any horse must be reported to the Bureau of Narcotics of the U.S. Department of the Treasury. § 4120.6(e). Violations of this section can result in revocation of a license and other penalties.

■ Plaintiffs argue that the December 9, 1997 search exceeded the scope of the regulations because inspectors sought evidence of general illegal activity not related to horse racing, including prostitu-

tion, human drug abuse and possession of knives, guns and other dangerous weapons. Plaintiffs essentially argue that because defendants' subjective intentions during the search apparently went beyond the scope of what the regulations allowed, the search was unconstitutional. This assertion is incorrect.

■ In determining the constitutionality of the search, the proper focus is on the inspectors' actions, not their motives. In other words, the defendants' behavior in conducting the search must be evaluated from an objective standpoint; their subjective motivation is irrelevant in determining whether the December 9, 1997 search was constitutional. See United States v. Dhinsa, 171 F.3d 721, 722 (2d Cir.1998). In Dhinsa, our Circuit addressed this issue in the context of Fourth Amendment search and seizure principles. The defendant Dhinsa argued that the search of his car during a traffic stop was unconstitutional because although the officers had seen him change lanes without signaling, their reason for pulling him over had nothing to do with the traffic violation but rather was motivated by their suspicion that Dhinsa and his passenger were involved in other crimes. The Court determined that "an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance." Dhinsa, 171 F.3d at 724–25. The Court continued, "Fourth Amendment cases require that we judge the reasonableness of an officer's actions based on the objective circumstances surrounding her actions and not on her subjective intent." Id.; see also Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify the action."). These principles are equally appli-

cable to valid warrantless administrative searches like the one at issue here.

While it is true that Leveson directed inspectors to look for evidence of criminal activity other than the use of equine drugs, the main purpose of the search was to find drugs and drug paraphernalia, including needles, syringes, and injection bottles, that might be used to affect horse races. Leveson's memo on how to conduct barn searches only addressed these matters. Searchers looked in barns, dormitories, cars and other places in which such materials logically would be hidden. Furthermore, all of the items recovered from the plaintiffs during the December 9 search, fell within the category of items outlined in the statute and regulations.[2]

Where inspectors are conducting an otherwise valid search and stumble across evidence of other illegal activity, the discovery and seizure of that evidence would not necessarily render the search invalid. The Court in *Burger* addressed this issue stating, "[n]or do we think that [an] administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself.... The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect." 482 U.S. at 716, 107 S.Ct. 2636.

Plaintiffs contend further that the search and regulations exceeded an allowable scope because the Racing, Pari–Mutu- el Wagering and Breeding Law, Section 301(2)(b) only gives the Board power to prevent the use of prohibited drugs in horses "about to participate" in a race. They urge a strict reading of "about to participate." This Court, however, finds it more logical to interpret "about to participate" more broadly. As defendants point out, horses are scheduled to race up to four days before a race is to occur. State Defendants' Post–Trial Memorandum of Law at 9. Furthermore, the illegal presence of drugs at a track where horses regularly race increases the likelihood that those drugs will be used on horses at any time before a race, whether it is 48 hours or 48 seconds. Insuring, through administrative inspections, that there are no prohibited drugs on race track grounds at any given time is a significant and appropriate step towards preventing the use of such substances on horses about to participate in a race.

Plaintiffs contend that the waivers they signed to obtain licenses in which they purportedly consented to warrantless searches are invalid because their consent was not voluntary. A search conducted pursuant to a valid consent is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (other citations omitted). However, " '[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.' " *Id.* (quoting *Bumper v. North Carolina*, 391

---

2. The following items were seized from the following plaintiffs during the December 9, 1997, search at Yonkers Raceway:

> Angelo Anabile Three syringes with needles seized from his barn area.
> Robert Rahner Two bottles of injectable penicillin taken from his barn area.
> Richard Fulfree Numerous syringes, needles and a cortisone product taken from his barn area and four bottles of injectable iodine with eight syringes seized from his vehicle.

> Joseph Omboni One syringe without needle and one bottle of Lasix taken from his barn area.
> George Fulfree Nothing, though his vehicle was stopped and searched and an investigator patted the outside of his pants and jacket pockets.
> Wardell Washington A substance that was suspected to be marijuana was taken from his dormitory room. Tests revealed that the substance was not marijuana.
> Michael Forte A large amount of equine drugs and numerous syringes and needles seized from his dormitory room.

U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)). The voluntariness of a search "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. 2041. Consent to search cannot be coerced, either by explicit or implicit means, or by implied threat or covert force. *Id.* at 228, 93 S.Ct. 2041. Moreover, consent to search must be determined under the circumstances of each search, rather than on the basis of a purported blanket waiver of rights. *Armstrong v. New York State Commissioner of Correction,* 545 F.Supp. 728, 731 (N.D.N.Y. 1982).

Since at least 1982, when the Board promulgated § 4120.6(d), plaintiffs and all licensed participants in the racing industry have been on notice that their justifiable privacy expectations were substantially reduced. As the Third Circuit wrote in a case involving New Jersey racing regulations, "all licensees have always participated in the industry with full awareness that it is the subject of intense state regulation." *Shoemaker v. Handel,* 795 F.2d 1136, 1141 (3d Cir.1986) (New Jersey Racing commission regulations permitting State Racing Steward to direct any official, jockey, trainer or groom to submit to breathalyzer and urine testing to detect alcohol or drug consumption does not violate Fourth Amendment).

■ When, as here, plaintiffs chose to continue to participate in this closely regulated business by renewing their licenses year after year, they did so with the knowledge that the Board had promulgated regulations providing for broad, warrantless searches. Year after year they knowingly signed the form waiving the right "to object to any search, within the grounds of a licensed racetrack or racing association, of any premises which I occupy or control or have the right to occupy or control and of my personal property, including a personal search, and the seizure of any article, the possession of which may be forbidden within such grounds." Thus, by accepting their New York State Racing Licenses, plaintiffs Anobile, Omboni, Forte, Washington, Rahner, and Richard Fulfree consented to searches such as the one that occurred on December 9, 1997. The regulations and waiver inform that stables, cars, rooms and other areas of the race track can be searched, as well as licensees' personal belongings. The plaintiffs were put on notice that such searches as the one on December 9, 1997, could, and most likely would, occur. That they were unaware of the particular day such a search would occur, does not invalidate the search. "If inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential." *Burger,* 482 U.S. at 710, 107 S.Ct. at 2648 (internal quotations omitted).

■ Plaintiffs argue that the fact that George Fulfree, the only plaintiff without an occupational license, was patted down while on racetrack grounds that day, further demonstrates that the conduct of the RWB officials was Constitutionally impermissible. As discussed above, George Fulfree was patted down by inspectors as he and his brother Richard Fulfree attempted to leave race track grounds. George testified that he voluntarily got out of Richard's car when inspectors requested that he do so, and that they then patted him down. George has not questioned the fact that he was in a restricted area, not freely accessible to the public. He does not contend that the patting of the outside of his garments to look for contraband was a seizure, was overly invasive or was otherwise unreasonable. In any event, he has not demonstrated that he had a reasonable expectation of privacy in what was admittedly a secure, restricted area. In the context of the search at issue here, the pat down of George Fulfree was conduct reasonably calculated to insure that contraband was not removed from a restricted area. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Camara v. Municipal Court of the City and County of San Francisco,* 387 U.S. 523, 87

S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Security and Law Enforcement Employees, District Council 82, American Federation of State, County and Municipal Employees, AFL—CIO v. Carey*, 737 F.2d 187, 201 (2d Cir.1984) ("[T]he test in a fourth amendment case is whether the search was reasonable.... [T]he court must balance the intrusiveness of the search on the individual's fourth amendment interests against its promotion of legitimate governmental interests.").

 Overall, the December 9, 1997 search was appropriate in time, place and scope. *See Burger*, 482 U.S. at 711, 107 S.Ct. 2636. It was completed in one day. The dormitory searches were completed between 6:30 a.m. and 11:30 a.m.; the barn search was conducted from 7:15 a.m. to 11:30 a.m. Inspectors took the time they needed to thoroughly search race track grounds. Once they searched a particular area, they moved on. Inspectors did not perform strip searches or other instrusive personal searches and searches did not occur outside racetrack grounds. Investigators were given detailed directions on procedures to follow during the search and they generally followed those procedures. For the reasons set forth above, plaintiffs' claims under 42 U.S.C. § 1983 alleging violations of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution are dismissed.

*Qualified Immunity*

 Defendants contend that Leveson is entitled to qualified immunity on plaintiffs' § 1983 claim, because his actions were objectively reasonable. "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *See, e.g., Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996). As discussed above, Leveson's actions in conducting the search did not violate the law. Indeed, the contours of the December 1997 administrative

searches of highly regulated areas such as race tracks were not clearly established. *See supra*, pp. 484–85.

### § 1985 Claim

 Plaintiffs generally allege a claim under 42 U.S.C. § 1985, but do not specify which subsection they believe applies. Section 1985(1) and the first clause of § 1985(2) address conspiracies to prevent federal officers from discharging their duties and conspiracies to interfere with proceedings in federal courts, respectively. *See Marden v. Dinin*, 22 F.Supp.2d 180, 186 n. 4 (S.D.N.Y.1998). Since plaintiffs have made no such allegations or provided proof for these claims, they are entitled to no relief under these provisions. The second clause of section 1985(2) applies only to conspiracies with respect to judicial proceedings in a State or Territory. *Herrmann v. Moore*, 576 F.2d 453, 457 (2d Cir.1978). This clause also does not apply to this case.

 Section 1985(3) provides, in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... if one or more persons ... do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is ... deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages.

42 U.S.C. § 1985(3). A conspiracy under this section must be motivated by racial or related class-based animus. *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir.1996) (citing *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 835–37, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)); *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir.1993). In

**490**

this case, plaintiffs have not shown that racial or other class-based animus motivated defendants' conduct. Plaintiffs here are owners, trainers, drivers, and a groom at Yonkers Raceway, whose property was searched on December 9, 1997. Their status as horsemen does not confer class-based status under § 1985(3). *See id.* ("The Supreme Court has explicitly declined to extend § 1985(3) to reach conspiracies based on economic or commercial views, status, or activities."); *see also Scott,* 463 U.S. at 837–39, 103 S.Ct. 3352 (beating of non-union employees does not constitute class-based animus under § 1985(3)). As a result, plaintiffs' § 1985 claim is dismissed.

*Claim V*

▮ Finally, plaintiffs' claim that Rule 4120.6 is *ultra vires* and vague in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Under § 202 of the State Administrative Procedure Act, however:

> A [judicial] proceeding may be commenced to contest a rule on the grounds of noncompliance with the procedural requirements of this section, . . . provided, however, such proceeding must be commenced within four months from the effective date of such rule. Each rule shall be promulgated in substantial compliance with the provisions of such sections, provided, however, the inadvertent failure to send notice to any person shall not serve to invalidate any rule promulgated hereunder.

N.Y. State Administrative Procedure Act, § 202(8). Rule 4120.6 was originally promulgated effective September 5, 1974, then repealed and filed June 4, 1982. It was then renumbered twice, then filed as an emergency measure on August 6, 1982. By order filed November 1, 1982, it was made permanent, effective November 1, 1982. NYCRR § 4120.6, Historical Note. As a result, any judicial proceeding challenging the validity of the rule should have been commenced by March 1, 1983. Plaintiffs' Claim V is dismissed as untimely.

## CONCLUSION

For the foregoing reasons, this Court concludes that Rule 4120.6 is valid and the December 9, 1997 search that was undertaken under its auspices was not unlawful and did not violate plaintiffs' constitutional rights. The Clerk of the Court is directed to enter a final judgment dismissing the Complaint.