**Angelo ANOBILE, Joseph Omboni, Jr., Michael Forte, Wardell Washington, Richard W. Fulfree, George P. Fulfree, and Robert Rahner, Plaintiffs–Appellants,**

**v.**

**Frank PELLIGRINO, Edward Martin, Michael J. Hoblock, Bennett Liebman, Joseph P. Neglia, Joel Leveson and the New York State Racing and Wagering Board, Defendants–Appellees.**

**Docket No. 99–9043.**

United States Court of Appeals, Second Circuit.

Argued April 6, 2000.

Decided Nov. 26, 2001.

Richard W. Fulfree, Yonkers, NY, for plaintiffs-appellants.

Charles F. Sanders, Assistant Attorney General, New York, NY (Eliot Spitzer, Attorney General of the State of New York, New York, NY, Edward Johnson, Deputy Solicitor General, Mark Gimpel, Assistant Solicitor General, of counsel), for defendants-appellees.

Before: VAN GRAAFEILAND and PARKER, Circuit Judges, and

UNDERHILL, District Judge.*

Judge VAN GRAAFEILAND dissents in a separate opinion.

PARKER, Circuit Judge.

This appeal challenges the lawfulness of a warrantless administrative search conducted at Yonkers Raceway ("the Raceway"), a harness racing facility in New York. The search encompassed racetrack facilities, racetrack dormitories, and individuals present at the Raceway and their personal belongings. The United States District Court for the Southern District of New York (Barrington D. Parker, Judge) held, following a bench trial, that the search was duly authorized by New York statutes and the New York Racing and Wagering Board's ("the Board") regulations, and that it survived constitutional scrutiny under the Fourth Amendment because the search was appropriate in time, place and scope. *See Anobile v. Pelligrino*, 66 F.Supp.2d 472, 483–89 (S.D.N.Y. 1999).

For the reasons set forth below, we affirm the district court in part, and reverse and remand in part. The Board had authority pursuant to its regulations, duly promulgated under New York Racing, Pari–Mutuel Wagering and Breeding Law ("Racing Law") §§ 101, 301, 902 (McKinney 2000), to conduct an administrative search of the racetrack facilities, barn areas, and vehicles in the barn areas. We conclude, however, that the search of the dormitory rooms violated the Fourth Amendment.

## I. BACKGROUND

### A. *The Parties*

All but one of the seven plaintiffs are licensed by the Board. Plaintiffs Angelo Anobile, Joseph Omboni, and Richard Fulfree are licensed as owners and trainers; Michael Forte and Richard Rahner are licensed as owners, trainers, and drivers; and Wardell Washington is licensed as a groom. Plaintiff George Fulfree has never been licensed by the Board.

The Board is an agency within the New York State Executive Department. *See* Racing Law § 101. The individual defendants were affiliated with the Board at times relevant to this action. Defendant Frank Pelligrino was the presiding judge at the Raceway; Edward Martin was the executive director of the Board; Michael Hoblock was the chairman of the Board; Bennett Liebman and Joseph Neglia were members of the Board; and Joel Leveson, the Acting Director of Investigations for the Board, was an employee of the Board.

### B. *The Statutory and Regulatory Scheme*

Horse racing, whether harness or thoroughbred, is the only sport in New York in which people may legally engage in pari-mutuel[1] wagering. *See Equine Practitioners Ass'n, Inc. v. New York State Racing and Wagering Bd.*, 105 A.D.2d 215, 219, 483 N.Y.S.2d 239, 242 (1st Dep't 1984), *aff'd and modified*, 66 N.Y.2d 786, 488 N.E.2d 831, 497 N.Y.S.2d 901 (1985); N.Y. Const. Art. I, § 9. The New York Legislature closely regulates the horse racing and wagering industry. *See* Racing Law §§ 101–624, 902. New York created the

* Stefan R. Underhill, United States District Judge for the District of Connecticut, sitting by designation.

1. "Pari-mutuel" is defined as "a betting pool in which those who bet on competitors finishing in the first three places share the total amount bet minus a percentage for the management." *Merriam–Webster's Collegiate Dictionary* 843 (10th Ed.2000).

New York State Racing and Wagering Board, within the executive department, and granted to it "general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the state and over the ... persons engaged therein." Racing Law § 101(1). With respect to harness racing, the Board is authorized to "supervise generally all harness race meetings in this state at which pari-mutual betting is conducted." *Id.* § 301(1). The Board is also empowered to license participants and employees at harness race meetings, and can deny or revoke a license if the "experience, character or general fitness of any applicant or licensee is such that the participation of such person in harness racing or related activities would be inconsistent with the public interest, convenience or necessity or with the best interests of racing generally." *Id.* § 309(2)(e).

In connection with this broad grant of authority, the New York Legislature authorized the Board to promulgate rules and regulations to carry into effect the purposes of sections 222 though 705 of the Racing Law. *Id.* § 301(1). In addition to those general regulatory powers, section 301(2) specifically authorizes the Board to "prescribe rules ... for effectually preventing the use of improper devices, the administration of drugs or stimulants or other improper acts for the purpose of affecting the speed of harness horses in races in which they are about to participate." *Id.* § 301(2)(a). Further, "[i]n order to assure the public's confidence and continue the high degree of integrity in racing at the pari-mutuel betting tracks," the Legislature authorizes "equine drug testing at race meetings" and authorizes the Board to issue regulations necessary to implement such testing. *Id.* § 902(1).

Pursuant to this statutory grant of power, the Board promulgated rules in connection with harness racing that regulate the use and possession of certain drugs and devices. *See* N.Y. Comp.Codes R. & Regs. tit. 9 ("NYCRR"), §§ 4120.1–4120.9 (1999). These rules restrict the use of certain drugs and substances, authorize a drug-testing program for horses, prohibit the use or possession of certain devices that may ultimately affect a horse's race performance, and permit only veterinarians to possess, among other items, hypodermic needles, syringes, and controlled substances. *See id.* Section 4120.6 prohibits the possession on the premises of a raceway of equine drug paraphernalia, any controlled substance listed in schedules I though IV of 21 U.S.C. § 812,[2] and any drug not approved for use in horses. *See* NYCRR § 4120.6(a). To enforce this prohibition, this section also authorizes the administrative inspection and examination of racing facilities and the personal property of persons therein. *See* NYCRR § 4120.6(d).[3]

2. These schedules are contained in the Uniform Controlled Substances Act, 21 U.S.C. § 801 *et seq.* The schedules contain numerous drugs generally used by people, and criminalize the possession, manufacture, and distribution of these substances. Among the substances included in the schedules are heroin, cocaine, LSD, and marijuana. *See* 21 U.S.C. § 812(c). Nothing in the record makes clear whether the drugs listed in schedules I through IV may be used to affect the speed of the horses used in harness racing. We do not decide whether the prohibition of substances other than equine drugs falls within the Board's statutory grant of regulatory authority.

3. This section provides:

Each track is required to use all reasonable efforts to prevent and detect violations of this section. Each track, the Board and the judges or their designees shall have the right to enter into or upon the buildings, stables, rooms, motor vehicles or other places within the grounds of such track to examine the same and to inspect and exam-

Additionally, pursuant to this regulatory provision and Racing Law section 309, the Board requires each licensee to execute a written waiver of the right to object to an administrative search by the Board. This waiver states:

> By the acceptance of a license issued pursuant to this application, I waive my rights to object to any search, within the grounds of a licensed racetrack or racing association, of any premises which I occupy or control or have the right to occupy or control and of my personal property, including a personal search, and the seizure of any article, the possession of which may be forbidden within such grounds.

*Anobile,* 66 F.Supp.2d at 478.

C. *The Search*

The district court outlined the specifics of the search in great detail, see *Anobile,* 66 F.Supp.2d at 477–82; therefore, we recite only those facts pertinent to our decision.[4]

Prior to the search at issue here, the Board, through its investigative staff (including defendant Joel Leveson), had conducted searches of barns at the Raceway, finding equine drugs, syringes and other contraband. On December 9, 1997, Leveson and 23 other employees of the Board, including an off-duty police officer handling a dog trained to detect narcotics, conducted a search at Yonkers Raceway, a harness racetrack licensed by New York State to conduct pari-mutuel betting. The search, characterized by Leveson as a "compliance audit," was conducted without a warrant.

The search was conducted pursuant to the order of Duke Dranichak, then-Chief of Racing Officials and Second Acting Director of Investigations. Leveson planned, formulated, and ultimately directed the search, which was prompted by reports of problems at the Raceway. These problems included: numerous unlicensed individuals on the racetrack; security's failure to secure the barn properly; security's unawareness of who was in the barns night and day; gates that were left open and unguarded; prostitution in the stable area and the dormitory area of the racetrack; common use of equine drugs on the backstretch by the horsemen; the arrest of racing participants in Harlem on cocaine possession charges; and the use of human drugs on the backstretch. Based on these "significant compliance problems," Leveson planned to search all areas of the Raceway including every barn, dormitory, vehicle and individual on Raceway property.

Prior to the search, Leveson distributed a memorandum to the investigators, inspectors and racetrack staff containing instructions for the search and procedures for searching dormitories, barns, vehicles and trailers. Regarding the dormitory rooms search, the memorandum stated that "the purpose is to find drugs, drug paraphanalia [sic] (needles, syringes, plastic packages of marijuana, cocaine, heroine [sic], etc.[,] pipes, mirrors or glass, straws

> ine the personal property and effects of any person within such places; and every person who has been granted a license by the board, by accepting his license, does consent to such search including a personal search and to the seizure of any drugs or hypodermic syringes, hypodermic needles or other devices and if the board shall find that any person has refused to permit any such search or seizure it may impose such punishment as may be appropriate.

NYCRR § 4120.6(d).

4. We note, as well, that the facts concerning the search are generally not disputed. Instead, plaintiffs' contentions on appeal focus on the district court's conclusion that the search was lawful.

for snorting lines of cocaine powder, crack vials, etc.) and other potentially dangerous items i.e.: guns, long knives, shaving blades, etc.... We are also looking for unauthorized persons being harbored illegally in the rooms." Regarding the barn search, the memorandum provided that "the purpose is to find needles, syringes, injection bottles."

The search of the entire premises began shortly before 7:00 a.m. and ended at approximately 8:00 p.m. During the morning hours, the team searched approximately 100 dormitory rooms. At each room, the investigators knocked, announced their purpose, searched the room, but not the person, and allowed the dog to sniff for drugs. The team also conducted barn and vehicle searches that morning and early afternoon. In the afternoon and lasting through the evening, the team searched incoming horse vans, trucks, and other vehicles.

The team searched each of the seven plaintiffs or their property that day. Inspectors checked Forte's license, searched him as he drove onto the raceway grounds, and later searched his dormitory room. The search of his room produced a plastic bag containing a hypodermic needle and syringes. Investigators searched Anobile's rented stall and trunks in the barn and found three syringes with needles. Searchers discovered a small amount of what they believed to be marijuana in Washington's dormitory room and required him to take four urine tests. The search of Omboni's possessions in the barn produced a syringe and a drug bottle. Investigators checked Rahner's license and searched his equipment, trunks and car, discovering two bottles of injectable penicillin. Investigators patted down Richard Fulfree and then searched his car, confiscating syringes, needles and white powder (a cortisone product). At the same time, searchers also stopped and patted down Richard Fulfree's brother, George, a non-licensee, but found nothing.

The investigators seized, inventoried, and sealed the alleged contraband and referred the matter to the Board. The Board suspended the license of each licensed plaintiff except Washington.[5] After the plaintiffs appealed their suspensions, the Board stayed the suspensions. The plaintiffs' licenses are currently in force pending the outcome of this litigation.

D. *Procedural History*

Plaintiffs filed this complaint in late December 1997, while the Board actions were still pending, in the United States District Court for the Southern District of New York. They asserted claims under 42 U.S.C. §§ 1983[6] and 1985[7], alleging that

5. The Board did not prove that the substance found in Washington's dormitory was marijuana, and Washington's urine tests were negative.

6. 42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

7. 42 U.S.C. § 1985 provides, in pertinent part:

> (3) Depriving persons of rights or privileges If two or more persons ... conspire ..., for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all

defendants' search was unreasonable and thus violated the plaintiffs' rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Additionally, plaintiffs alleged that section 4120 of the Board's rules is "ultra vires" and vague in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution. Finally, seeking a preliminary injunction, plaintiffs alleged that the Board was threatening to "use the fruits of the illegal search and seizure" against some of the plaintiffs and that they suffered "irreparable injury" as a result of having to defend themselves in administrative, civil and criminal proceedings. Plaintiffs sought compensatory and punitive damages against the individual defendants, a declaration that section 4120 of the Board's rules is unconstitutional, and an injunction preventing the Board from proceeding with its disciplinary process and from using the "fruits" of the search.

The district court consolidated the preliminary injunction hearing with the trial on the merits, and conducted a bench trial on March 29–31, 1999.[8]

On August 25, 1999, the district court rendered its decision, concluding that the search was constitutional, that the plaintiffs failed to state a claim under 42 U.S.C. § 1985, and that plaintiffs' ultra vires challenge to section 4120.6 was untimely. *See Anobile,* 66 F.Supp.2d at 489–90. Regarding the constitutionality of the search, the district court stated:

> Overall, the December 9, 1997 search was appropriate in time, place and scope. *See Burger,* 482 U.S. at 711, 107 S.Ct. 2636. It was completed in one day. The dormitory searches were completed between 6:30 a.m. and 11:30 a.m.; the barn search was conducted from 7:15 a.m. to 11:30 a.m. Inspectors took the time they needed to thoroughly search race track grounds. Once they searched a particular area, they moved on. Inspectors did not perform strip searches or other intrusive personal searches and searches did not occur outside racetrack grounds. Investigators were given detailed directions on procedures to follow during the search and they generally followed those procedures.

*Anobile,* 66 F.Supp.2d at 489. The district court concluded that section 4120.6(d) sufficiently notified the plaintiffs of the likelihood of a search, and reduced their privacy expectations. *See id.* at 488. The district court also held that, because the licensed plaintiffs chose to continue to participate in the closely regulated business of harness racing, and signed license applications which notified them of the Board's authority to search all property on racetrack grounds, these plaintiffs had given the equivalent of consent to such searches. *See id.* The district court further concluded that the search of George Fulfree, an individual not licensed by the Board, was permissible because he had not demonstrated a reasonable expectation

persons within such State or Territory the equal protection of the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

8. Before trial, defendants moved to dismiss the case for money damages against the Board and its members in their official capacities on sovereign immunity grounds. The district court granted this motion, *see Anobile,* 66 F.Supp.2d at 476, and plaintiffs do not appeal this aspect of the district court's decision.

Additionally, after the close of evidence on March 31, 1999, the district court dismissed plaintiffs' § 1983 claims for money damages against defendants Pelligrino, Martin, Hoblock, Liebman and Neglia based on qualified immunity grounds. *See Anobile,* 66 F.Supp.2d at 476. Plaintiffs do not appeal this aspect of the district court's decision.

of privacy in a secure, restricted area at the racetrack. *See id.* at 488–89.

Judgment was entered for defendants on August 30, 1999. Plaintiffs' appeal followed.

## II. DISCUSSION

### A. *Scope of the Appeal*

■ Plaintiffs' Notice of Appeal indicates that they are appealing the August 30, 1999 order of the United States District Court of the Southern District of New York. Generally, absent prejudice to the appellees, this Court interprets an appeal from a specific order disposing of the case as an appeal from the final judgment, which incorporates all previous interlocutory judgments in that case and permits their review on appeal. *See Shannon v. Gen. Elec. Co.,* 186 F.3d 186, 192 (2d Cir. 1999).

Here, however, plaintiffs' brief effectively limits the issues on appeal to the constitutionality of the search on the separate bases that (1) the enabling statute did not authorize such a search, (2) the search was unreasonable under the Fourth Amendment with respect to the search for criminal contraband and the search of the dormitories, and (3) the signed waivers consenting to those searches were invalid.

### B. *Analysis*

■ On appeal from a bench trial, this Court reviews a district court's findings of fact for clear error and conclusions of law de novo. *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir.1999)(citing *Lopresti v. Terwilliger,* 126 F.3d 34, 38–39 (2d Cir.1997)).

#### 1. *Regulatory and Statutory Authority for the Search*

NYCRR section 4120.6(a) states, in relevant part:

> No person ... shall have or possess in or upon the premises of a licensed harness race track, including premises which he occupies or has a right to occupy, ... the following: (1) any equipment which may be used for hypodermic injection or other infusion into a horse or any vial, bottle, or cartridge designed and usable for such purposes; or (2) any controlled substance, listed in schedule I through IV of the United States Code, title 21 (Food and Drugs) section 812, or any drug which has not been approved for use in the horse by the Federal Food and Drug Administration.

The lists contained in Schedules I though IV of 21 U.S.C. § 812 include the drugs outlined in Leveson's dormitory search memorandum, as well as other drugs for human consumption.

NYCRR section 4120.6(d) provides authority to the Board and judges of each track to

> enter into or upon the buildings, stables, rooms, motor vehicles or other places within the grounds of each track to examine the same and to inspect and examine the personal property and effects of any person within such places; and every person who has been granted a license by the board, by accepting his license, does consent to such search including a personal search and to the seizure of any drugs....

Section 4120.6(d), when read in conjunction with section 4120.6(a), provides explicit authority to search raceway property, provided that this regulation was promulgated pursuant to statutory constitutional authority.

■ The Board's statutory powers include the authority to license participants in harness racing, and to supervise and promulgate rules to regulate such racing. *See* Racing Law §§ 101, 301(1), 309(1).

Racing Law section 101 creates the Board, and confers upon its members "general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the state and over the corporations, associations, and persons engaged therein." Racing Law section 301(1) provides the Board with the power to "adopt rules and regulations ... to carry into effect its purposes" which include the "power to supervise generally all harness race meetings in this state at which pari-mutuel betting is conducted." The broad grant of "general jurisdiction" contained in section 101 combined with the rule-making authority in section 301 provides authority to the Board to promulgate regulation 4120.6.[9] New York case law supports this conclusion:

> Pursuant to subdivision 1 of section 101 of the Racing, Pari-Mutuel Wagering and Breeding Law, the Board exercises "general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the state and over the corporations, associations, and persons engaged therein." The Board's statutory powers specifically include the power to prescribe rules and regulations in order to prevent "the use of improper devices, the administration of drugs or stimulants or other improper acts for the purpose of affecting the speed" of the horses that are about the participate in races. (Racing, Pari-Mutuel Wagering and Breeding Law, § 301, subd 2, par. b.) In addition, "An administrative agency, as a creature of the Legislature, is clothed with those powers expressly conferred by its authorizing statute, *as well as those required by necessary implication.*" [10]

*Equine Practitioners Ass'n,* 105 A.D.2d at 219, 483 N.Y.S.2d 239 (citations omitted) (emphasis added). In the language of *Equine Practitioners,* the Board is "clothed with" power to prevent and detect equine drug possession in race track grounds "by necessary implication" from sections 101 and 301 of the Racing Law. *Equine Practitioners,* 105 A.D.2d at 219, 483 N.Y.S.2d 239. The broad powers granted to the Board by the New York state legislature, and the regulations promulgated therefrom, provide sufficient statutory authority to conduct the challenged search, so long as the scheme passes constitutional muster and the search does not otherwise violate the Fourth Amendment.

2. *Constitutionality of the Regulatory Scheme*

Plaintiffs contend that the search violated their right to be free from unreasonable searches and seizures, under the Fourth Amendment. *See* U.S. Const. amend. IV.

The Fourth Amendment protects against unreasonable searches of commercial premises. *See New York v. Burger,* 482 U.S. 691, 699, 107 S.Ct. 2636, 96

9. Section 301(2)(a), which provides explicit authority to the Board to prevent equine drug use, does not detract from this conclusion. Section 301(1) provides sufficient general authority to promulgate a regulation prohibiting possession of equine drugs. Furthermore, section 301(2) provides its authority "[w]ithout limiting the generality of the foregoing, and in addition to its other powers."

10. Although the *Equine Practitioners* court held that sections 101 and 301 provide statutory authority for NYCRR § 4120.6 (then 4120.5), we cannot rely upon this case as authority. The New York Court of Appeals modified the court's order by "deleting the declaration insofar as it relates to the rules as to warrantless searches" because the plaintiffs lacked standing to assert that claim. *Equine Practitioners Ass'n, Inc. v. New York State Racing and Wagering Bd.,* 66 N.Y.2d 786, 789, 497 N.Y.S.2d 901, 488 N.E.2d 831 (1985). This modified order does not affect the quoted language, however.

L.Ed.2d 601 (1987). In general, a state actor must obtain a warrant based on probable cause to lawfully execute a search. *See id.; Camara v. Mun. Court of the City and County of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Under certain circumstances, however, the Fourth Amendment permits warrantless administrative searches of commercial property. *See Donovan v. Dewey,* 452 U.S. 594, 598–99, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981).

> The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections.

*Id.* at 599, 101 S.Ct. 2534 (citing *United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972)).

In closely regulated industries, for example, warrantless administrative searches of commercial premises conducted pursuant to a regulatory scheme are constitutionally permitted if they meet three criteria:

> First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made....
>
> Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." *Donovan v. Dewey,* 452 U.S., at 600, 101 S.Ct. 2534. For example, in *Dewey,* we recognized that forcing mine inspectors to obtain a warrant before every inspection might alert mine owners or operators to the impending inspection, thereby frustrating the purposes of the Mine Safety and Health Act—to detect and thus to deter safety and health violations. *Id.,* at 603, 101 S.Ct. 2534.
>
> Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Ibid.* In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.... To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan v. Dewey,* 452 U.S., at 600, 101 S.Ct. 2534. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be "carefully limited in time, place and scope." *United States v. Biswell,* 406 U.S., at 315, 92 S.Ct. 1593.

*Burger,* 482 U.S. at 702–03, 107 S.Ct. 2636.

Plaintiffs assert that the enabling statute (as opposed to the regulatory scheme as a whole) must meet these criteria in order for the search to be constitutional. We disagree. Contrary to plaintiffs' position, the warrantless search exception applies to searches authorized pursuant to valid agency regulations, as well as to statutes. In *Burger,* the Supreme Court defined the exception as applying to "regulatory scheme[s]" and, although *Burger* concerned a statute, the Supreme Court did not limit the analysis to searches expressly authorized by a statute. *See id.* at 702, 107 S.Ct. 2636. Not surprisingly, therefore, this Court and at

least one other circuit have applied the *Burger* analysis to administrative searches conducted pursuant to an agency rule or regulation. *See, e.g., Blue v. Koren,* 72 F.3d 1075, 1080–81 (2d Cir.1995) (applying *Burger* analysis to nursing home regulations); *LeRoy v. Illinois Racing Bd.,* 39 F.3d 711, 712–15 (7th Cir.1994) (warrantless search conducted pursuant to state agency regulations concerning horse racing industry); *Dimeo v. Griffin,* 943 F.2d 679, 680–85 (7th Cir.1991) (same).

Because the enabling statute authorized the Board's regulations and because the plaintiffs concede that the regulations authorize the search, the plaintiffs' challenge to the scheme under which the search was conducted must fail. We therefore do not decide whether the regulations satisfy *Burger.*

3. *Constitutionality of the Search as Conducted*

Plaintiffs argue that, even if the search was duly authorized by regulations which satisfied the administrative warrantless search exception to the warrant requirement, the search conducted was unconstitutional. Plaintiffs contend that the search exceeded the permissible scope of the administrative search, because the search included the dormitories, which are not commercial property, and because its purpose was to uncover criminal violations unrelated to horse racing. Additionally, plaintiffs argue that the clauses contained in their license applications do not constitute consent to search their persons or property. We address each contention in turn.

a. *Dormitories as Homes*

The plaintiffs assert that the search of the dormitories located on the racetrack was unconstitutional because the dormitory rooms are "homes" for the purposes of the Fourth Amendment, in which residents hold greater expectations of privacy, and therefore require greater protection, than in commercial premises.

Plaintiffs rely on *Serpas v. Schmidt,* 827 F.2d 23, 28–29 (7th Cir.1987), *abrogated in part by LeRoy v. Illinois Racing Bd.,* 39 F.3d 711, 714 (7th Cir.1994), for support of their "dormitories as homes" argument. In *Serpas,* the Seventh Circuit agreed that "dormitory rooms must be considered the backstretchers' 'homes' for Fourth Amendment purposes" because they were "exclusively residential" and there was "no evidence that the backstretchers conduct any of their business in the rooms." *Id.* at 28. Although *Serpas* 's holding was based, in part, on language in the Illinois statute providing that the search authority was limited to "the office, horse race track, facilities and *other places of business,*" we agree with its reasoning and its ultimate conclusion that the dormitories must be considered "homes" for Fourth Amendment purposes. *Id.* (emphasis added). Although New York's regulatory regime, at issue here, explicitly provides that the Board or its designees "shall have the right to enter into or upon the buildings, stables, *rooms,* motor vehicles or other places within the grounds of such track to examine the same," NYCRR § 4120.6(d) (emphasis added), we conclude that this phrase cannot constitutionally extend to the dormitories, which are solely used as residences for racetrack employees.

The Fourth Amendment protects people from unreasonable searches. *See* U.S. Const. amend. IV; *United States v. Elliott,* 50 F.3d 180, 185 (2d Cir.1995). Unreasonableness is gauged in part by the degree of expectation of privacy and the intrusiveness of the search. *See, e.g., United States v. Lovelock,* 170 F.3d 339, 345 (2d Cir.1999) (noting reduced privacy expectations in, for example, situations

where a person occupies the premises jointly with another). "To determine reasonableness, the court must balance the intrusiveness of the search on the individual's fourth amendment interests against its promotion of legitimate governmental interests." *Sec. and Law Enforcement Employees v. Carey,* 737 F.2d 187, 201 (2d Cir.1984).

Privacy expectations are high in homes, or even private rooms. *See United States v. United States Dist. Court for the Eastern Dist. of Mich., S. Div.,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"); *United States v. Mankani,* 738 F.2d 538, 544 (2d Cir.1984); *see also Stoner v. California,* 376 U.S. 483, 489, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel rooms accorded Fourth Amendment protections); *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (rooms in rooming house); *Smyth v. Lubbers,* 398 F.Supp. 777, 785 (W.D.Mich.1975) (college dormitories). Here, the Board conducted a search of dormitories, rooms used as residences by Raceway employees. Because homes receive the highest Fourth Amendment protections, we conclude that such a search is highly intrusive. We note, however, that the notice contained in the license applications informing licensees of the likelihood of a search does give rise to a somewhat reduced expectation of privacy. Despite this notice, we cannot say that the reduction is sufficient to overcome the high expectation of privacy which automatically attaches to these dormitory rooms, which serve as the resident's homes.

The governmental interest at stake concerns the integrity of harness racing in New York. We acknowledge this to be a substantial interest, but warrantless searches of residences are not necessary to further this purpose. The authority to uncover equine drugs and drug paraphernalia with warrantless searches of the vehicles,. barns and persons located in the racetrack area, as provided in NYCRR § 4120.6 sufficiently protects the integrity of New York's racing industry. Intrusion into someone's home is simply not necessary. We therefore conclude that, although the regulation provides authority to search "rooms," this authority cannot extend to allow warrantless searches of the homes located at the Raceway.

Neither the Supreme Court nor this Court has ever permitted warrantless administrative searches of a person's residence absent exigent circumstances or unless business was conducted in the home. *Cf. Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 17 L.Ed.2d 312 (1967) (where home is "converted into a commercial center ... that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street"). Indeed, the Supreme Court has held administrative searches of homes to be unconstitutional, even in the face of compelling circumstances. *See Michigan v. Clifford,* 464 U.S. 287, 291–92, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (concluding that strong expectations of privacy, even in fire-damaged residences, prevent a warrantless search to determine the cause and origin of the fire absent consent or exigent circumstances); *Camara,* 387 U.S. at 534–39, 87 S.Ct. 1727 (concluding that a warrant is required to conduct an administrative search of a residence located in the commercial area of an apartment building). Given the Supreme Court precedent emphasizing the strong privacy interest in homes, we decline to take a step to erode this strong interest, as appellees have invited us to do in this case.

The decisions authorizing warrantless searches of commercial premises do not alter our conclusion. The Supreme Court has noted that this exception to the warrant requirement applies where "the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy," *Burger,* 482 U.S. at 702, 107 S.Ct. 2636, because "certain industries have ... a history of government oversight," *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 313, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). The dormitory residents here, although likely aware that the racing industry in New York is highly regulated, have made their homes in these dormitories. There is no evidence that the residents have conducted business in these rooms. Thus, because we conclude that dormitories enjoy the sanctity accorded private residences, we hold that the warrantless search of the dormitories at Yonkers Raceway violated the Fourth Amendment.

b. *Criminal Purpose*

Plaintiffs also assert that the search was unconstitutional because it sought to uncover criminal activity not related to horse racing or the activities prohibited by the regulatory scheme. Plaintiffs contend that the search was prompted by rumors of prostitution in the stable area and drug use on the backstretch, and the search was thus actually motivated by the detection of criminal activity at the Raceway. Indeed, Leveson testified that the initial motivation for the search of the entire Yonkers Raceway resulted from information regarding prostitution and drug use.

The district court concluded that the subjective motives of an inspector are irrelevant; instead, the lawfulness of the search is based on the objective circumstances surrounding it. *See Anobile,* 66 F.Supp.2d at 486 (citing *United States v. Dhinsa,* 171 F.3d 721, 722 (2d Cir.1998)).

The district court's reliance on *Dhinsa* is misplaced. The Supreme Court has stated that "the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are *not* made for those purposes." *Whren v. United States,* 517 U.S. 806, 811–12, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "[W]hile subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis, programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion." *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 455, 148 L.Ed.2d 333 (2000) (internal quotation marks and citation omitted). Here, because this was an administrative search, and not an "ordinary" search based on either individualized suspicion or probable cause, the purposes (and therefore scope) of the search are indeed relevant. *See id.* at 457.

In *Burger,* the Supreme Court recognized that a "State can address a major social problem *both* by way of an administrative scheme *and* through penal sanctions." *Burger,* 482 U.S. at 712, 107 S.Ct. 2636. "The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect." *Id.* at 716, 107 S.Ct. 2636. The Supreme Court has acknowledged, however, that a search may be invalid if the administrative inspection was a "pretext" for obtaining evidence of general criminal activity. *Id.* at 716–17 n. 27, 107 S.Ct. 2636. In *City of Indianapolis v. Edmond,* the Supreme Court held unconstitutional an Indianapolis roadside checkpoint

program whose primary purpose was narcotics detection, and this purpose was "ultimately indistinguishable from the general interest in crime control." *Edmond,* 121 S.Ct. at 458. The Supreme Court rejected the city's argument that the program was justified by its "lawful secondary purposes of keeping impaired motorists off the road and verifying licenses and registrations." *Id.* at 457. Because the city conceded that the primary purpose of the checkpoint program was narcotics detection, the Court expressed no view on "whether the State may establish a checkpoint program with the primary purpose of checking licenses or driver sobriety and a secondary purpose of interdicting narcotics." *Id.* at 457 n. 2. The Supreme Court has not directly addressed the constitutionality of searches subject to a "mixed purpose," where the primary purpose is legitimate and the secondary purpose is not.

The dormitory search was arguably such a "mixed purpose" search, whose scope was broader than that provided in the regulations. The purpose of the search of the dormitories at the Yonkers Raceway, as outlined in Leveson's memorandum, was "to find drugs, drug paraphanalia [sic] (needles, syringes, plastic packages or marijuana, cocaine, heroine [sic], etc.[,] pipes, mirrors or glass, straws for snorting lines of cocaine powder, crack-vials, etc.)." Leveson's memo also listed other purposes as well, including finding "other potentially dangerous items i.e. guns, long knives, shaving blades, etc." and locating "unauthorized persons being harbored illegally in the rooms."

Locating equine drugs and drug paraphernalia is certainly within the scope of the administrative searches contemplated by section 4120.6. The dormitory search instruction included, however, "other dangerous items" such as guns or knives and "unauthorized persons being harbored illegally in the rooms." Section 4120.6 does not provide authority to conduct a search to uncover these things; indeed the title of section 4120.6 is "Possession of hypodermic equipment and controlled substances."

Because we have already concluded that the dormitory search was unconstitutional, however, we need not decide whether this "mixed purpose" search exceeded a constitutionally allowable scope. Principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case. *See Horne v. Coughlin,* 191 F.3d 244, 246 (2d Cir.1999) (citing Supreme Court precedent).[11] We therefore do not reach plaintiffs' alternative argument regarding the dormitory searches.

We do reach, however, plaintiffs' challenge of the barn and vehicle searches, and uphold their constitutionality. The purpose, as outlined in Leveson's memo, of the barn searches was narrow: "The purpose is to find needles, syringes, injection bottles (plastic or glass)." The purpose of the vehicle search was likewise limited. Section 4120.6 specifically allows searches of racetrack premises, as well as the personal property and effects of person within the Raceway grounds, to uncover drugs and drug paraphernalia, and, as we concluded earlier, the purpose of this regulatory scheme is to prevent possession of drugs and drug paraphernalia which could affect the speed of horses about to race. The vehicle and barn searches, as well as the license checks and pat-downs incident to these searches, fall within the scope of

11. We do note, however, that *Burger*'s reasoning indicates that a search to uncover items not included in the regulation permitting the search would be unconstitutional as exceeding its allowable scope. *See Burger,* 482 U.S. at 702, 107 S.Ct. 2636 (noting that the regulatory scheme allowing for a search must have a "properly defined scope").

the regulations. Because these searches all occurred in areas of the racetrack where the highly regulated activities addressed by the regulations were taking place, i.e., where horses were stabled and prepared to race, we conclude that the regulations provided persons present in those areas with sufficient notice of the likelihood of a search to satisfy the Fourth Amendment.[12] Plaintiffs Anobile, Omboni, Rahner, George Fulfree and Richard Fulfree were subject only to these types of searches, which we have concluded were within the parameters of the regulation. The claims of these plaintiffs therefore must fail.

c. *Consent to Search*

Defendants contend that plaintiffs consented to the challenged search by accepting and renewing their licenses, because the license application contained a waiver of plaintiffs' rights to object to any search conducted at the Raceway. The district court agreed, and held that the licensees had consented to the search of their persons and property by signing the license applications and by accepting the licenses. *See Anobile,* 66 F.Supp.2d at 487–88. On appeal, the plaintiffs argue that these waivers were invalid, contending that the waivers were neither knowing nor intelligent. We need only address whether these waivers provide effective consent for the dormitory searches, as we have already concluded that the remainder of the search was constitutional. It is axiomatic that a state actor does not need consent to conduct a constitutionally permissible search.

It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "To ascertain whether consent is valid, courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Garcia,* 56 F.3d 418, 422 (2d Cir.1995) (internal quotation marks and citations omitted). The official claiming that a search was consensual has the burden of demonstrating that the consent was given freely and voluntarily. *See Schneckloth,* 412 U.S. at 222, 93 S.Ct. 2041.

We addressed a similar situation in *Security and Law Enforcement Employees v. Carey,* 737 F.2d 187 (2d Cir.1984). In that case, a group of corrections officers challenged strip and body cavity searches conducted at various New York correctional facilities. *See id.* at 200. Defendants pointed out that each of the corrections officers had received a rule book containing notice that employees on correctional facility premises were subject to search. *See id.* at 201–02. To the extent that the defendants asserted that the plaintiffs had consented to these searches by receiving the rule book and accepting employment, we rejected that assertion. *See id.* at 202 n. 23. We noted that a "careful scrutiny of the totality of the circumstances" was required to make a determination regarding the voluntariness of such "consent" and that an important component of this inquiry was "evidence that the person had knowledge of the right to refuse to give consent." *Id.*

12. We do not decide whether the regulations provide racetrack spectators, present in areas of the racetrack grounds removed from horses, with notice of the possibility of an administrative search sufficient to permit searches of their vehicles or pat-downs of their persons.

Indeed, coercion may be found where one is given a choice between one's employment and one's constitutional rights. *Cf. Garrity v. New Jersey,* 385 U.S. 493, 496, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) ("The choice imposed on petitioners was one between self-incrimination or job forfeiture. Coercion that vitiates a confession ... can be mental as well as physical; the blood of the accused is not the only hallmark of an unconstitutional inquisition. Subtle pressures may be as telling as coarse and vulgar ones.") (internal quotation marks and citation omitted). On the other hand, as we noted in *Security and Law Enforcement Employees,* such advance notice of a possible search are "factors to be taken into account in determining the extent of the legitimate expectations of privacy." *Sec. and Law Enforcement Employees,* 737 F.2d at 202 n. 23. In this instance, however, we have already concluded that the notice of a possible "room" search, contained in the license applications and the regulation itself, did not sufficiently reduce the legitimate expectation of privacy that the dormitory residents possessed with respect to their homes such that a warrantless search was permissible.

Examining the totality of the circumstances applicable here, we conclude that the plaintiffs' acceptance of their licenses and their signatures on the license applications do not constitute effective consent to the dormitory searches conducted here. As a condition of receiving a license, required for employment in New York's racing industry, the Board demanded acquiescence to a blanket waiver of the right to object to any future searches of the plaintiffs' residences. We previously concluded that the Board's interest in conducting such warrantless searches was outweighed by the plaintiffs' high expectation of privacy in their homes, making the search unconstitutional. We therefore conclude that the demand embodied by the waiver provision in the license application is unreasonable, and we refuse to construe plaintiffs' yearly license application as effective consent. Additionally, there is no evidence demonstrating that the plaintiffs were aware of their right to refuse to give consent to this unconstitutional search or indeed whether they could refuse and still obtain employment. *See Sec. and Law Enforcement Employees,* 737 F.2d at 202 n. 23. We therefore hold that plaintiffs' acquiescence by signing the license application from year to year does not constitute consent, and does not render the dormitory search constitutional.

4. *Qualified Immunity*

Having concluded that the dormitory search violated plaintiffs' Fourth Amendment rights, we must now address whether Joel Leveson is entitled to qualified immunity. Although the district court concluded that no constitutional violation occurred, it also implicitly held that Leveson would be entitled to qualified immunity in any event because "the contours of the December 1997 administrative searches of highly regulated areas such as race tracks were not clearly established." *Anobile,* 66 F.Supp.2d at 489. Because we disagree with the district court's Fourth Amendment conclusion, we directly address the qualified immunity issue. In so doing, however, we agree with the district court's implicit conclusion that Leveson is entitled to qualified immunity.

The doctrine of qualified immunity provides immunity to government officials sued in their individual capacity in any of three situations: (1) if the conduct at issue is not prohibited by federal law; (2) even if the conduct was prohibited, if the plaintiff's right was not clearly established at the time of the conduct; or (3) if the

defendant's conduct was objectively legally reasonable in light of clearly established law. *X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 66 (2d Cir.1999).

We have already concluded that the plaintiffs whose rooms were searched have demonstrated a violation of their Fourth Amendment rights. Therefore, we must determine if the right violated was clearly established at the time of the conduct. *See X-Men,* 196 F.3d at 66. For a right to be clearly established,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal citations omitted).

We believe that the issue presented in this case, whether dormitories located on the premises of a highly regulated business deserve the same Fourth Amendment protections afforded to private residences, was hardly clearly established in December 1997. At the time of the search, competing Supreme Court and Second Circuit precedent potentially applied to this issue. On one hand, some cases hold that warrantless administrative searches are permissible where the regulatory scheme concerns an important government interest, and the scheme provides notice to the proprietors of commercial premises of the likelihood of searches. *See, e.g., Burger,* 482 U.S. at 702–03, 107 S.Ct. 2636; *Donovan,* 452 U.S. at 598–99, 101 S.Ct. 2534. On the other hand, some cases hold that homes, and even private rooms, are accorded the highest Fourth Amendment protections. *See, e.g., Stoner,* 376 U.S. at 489, 84 S.Ct. 889; *McDonald,* 335 U.S. at 455–56, 69 S.Ct. 191; *Smyth,* 398 F.Supp. at 785. As of the time of the search at issue, no decision of this Court had addressed, even generally, the permissibility of searching residential rooms on the grounds of a highly regulated commercial enterprise. We therefore agree with the district court that the law governing the searches of dormitories on racetrack grounds was not clearly established at the time of this search.

We therefore hold that Joel Leveson is entitled to qualified immunity. Because of this conclusion, and plaintiffs' failure to appeal any of the district court's prior immunity decisions, plaintiffs' claims for money damages are dismissed and only injunctive relief is potentially available on remand.

## III. CONCLUSION

For the foregoing reasons, we uphold the constitutionality of the barn and vehicle searches conducted at Yonkers Raceway in their entirety. We therefore affirm the dismissal of the claims of plaintiffs Anobile, Omboni, Richard and George Fulfree, and Robert Rahner. We conclude, however, that the search of the dormitory rooms violated the Fourth Amendment, as a warrantless search of plaintiffs' homes. The regulation's authority to search "rooms" located on the Raceway premises cannot encompass warrantless searches of homes located on the premises. Although the search directed by Leveson violated the Fourth Amendment, we conclude that he is entitled to qualified immunity.

Accordingly, the district court's decision is affirmed in part, and reversed in part. We remand to the district court for a determination of whether plaintiffs Forte

and Washington are entitled to injunctive relief and, if so, the scope of such relief.

VAN GRAAFEILAND, J., dissenting:

Since the tragic September 11th terrorist attack on the World Trade Center and the Pentagon, the Country as a whole has come to believe that effective law enforcement requires closer attention to what possible illegal activities are taking place behind proverbial "closed doors." However, my colleagues are pointing this Court in the opposite direction by reversing the considered and well reasoned opinion of, then, District Judge Barrington Parker reported at 66 F.Supp.2d 472. In doing so, they either ignore or erroneously overrule Judge Parker's findings of fact.

At the outset, I believe that my colleagues clearly err in their apparent belief that the betting public would not be adversely affected by information that the back stretch of one of New York State's major race tracks was infested with all sorts of criminal wrong doing and that this would have no deleterios effect on the income derived by the State from their wagering. *See, e.g., Dimeo v. Griffin,* 943 F.2d 679, 682–85 (7th Cir.1991); *Tappis v. New York State Racing and Wagering Bd., Harness Racing Div.,* 36 N.Y.2d 862, 370 N.Y.S.2d 922, 331 N.E.2d 697 (Mem. 1975); *Shoemaker v. Handel,* 795 F.2d 1136, 1141 (3d Cir.1986). Betters have no desire to throw their money into a criminal cesspool. This incontrovertible fact justified the Association in its rule making decisions, in the "best interests of racing generally." *See Boreali v. Axelrod,* 71 N.Y.2d 1, 10–11, 523 N.Y.S.2d 464, 517 N.E.2d 1350 (1987); *Matter of Sullivan County Harness Racing Ass'n, Inc. v. Glasser,* 30 N.Y.2d 269, 278–79 (1972). The fact that this protection was accomplished by regulation rather than by statute does not impair its validity. "The Legislature in our view, properly delegated to the Commission very broad power to regulate the harness racing industry." *Id.* at 277, 332 N.Y.S.2d 622, 283 N.E.2d 603. The Commission did not exceed its authority when it promulgated the regulations at issue, *Id.* at 278–79, 332 N.Y.S.2d 622, 283 N.E.2d 603.

In an alternative effort to bolster their case, appellants assert that the search of the dormitory rooms was unconstitutional because the rooms were "homes" for the purpose of the Fourth Amendment. In making this argument, appellants proceed on the theory that a "home", as a physical structure is protected by the Fourth Amendment against warrantless entry. What the Fourth Amendment insures, however, is that no search "will occur that is unreasonable" and one of the elements that can make a search "reasonable" is the consent of an owner or resident. *Illinois v. Rodriguez,* 497 U.S. 177, 183–84, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). "The constitutional test for such search is reasonableness." *United States v. Jackson,* 825 F.2d 853, 872 (5th Cir.1987). In other words, the Fourth Amendment protects people, not places. *United States v. Bunkers,* 521 F.2d 1217, 1219 (9th Cir.1975). People, unlike places, can give consent to what otherwise might be an unlawful search. The cases so holding are legion. *See, e.g., Ohio v. Robinette,* 519 U.S. 33, 38–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Schaper,* 903 F.2d 891, 895 (2d Cir.1990); *United States v. Ramirez–Cifuentes,* 682 F.2d 337, 344 (2d Cir.1982); *United States v. Forero–Rincon,* 626 F.2d 218, 224 (2d Cir.1980); *United States v. Wiener,* 534 F.2d 15 (2d Cir. 1976); *United States v. Miley,* 513 F.2d

1191, 1201 (2d Cir.), *cert. den.* 423 U.S. 842, 96 S.Ct. 74, 75, 46 L.Ed.2d 62 (1975).

Because horse racing is a closely regulated business, all employees must be licensed and regularly make signed applications for their licenses. Each application contains a printed notice in which the applicant waives his or her right to object to searches. The district court described the process as follows:

> When, as here, plaintiffs chose to continue to participate in this closely regulated business by renewing their licenses year after year, they did so with the knowledge that the Board had promulgated regulations providing for broad, warrantless searches. Year after year they knowingly signed the form waiving the right "to object to any search, within the grounds of a licensed racetrack or racing association, of any premises which I occupy or control or have the right to occupy or control and of my personal property, including a personal search, and the seizure of any article, the possession of which may be forbidden within such grounds."

66 F.Supp.2d at 488.

One need not have the learning of a Rhodes scholar to understand the meaning of this clearly-worded provision. Moreover, no one forced applicants to participate in the horse racing business and no one compelled them to utilize the "homes" provided by the track.[1] Such participation and usage were voluntary on their part, and the district court's factual finding to that effect is binding on this Court.

As I intimated at the outset of this brief dissertation, I believe that Judge Barrington Parker wrote an excellent opinion, one that I willingly would have accepted as my own. I regret that my colleagues, after wrestling with it for more than a year, have come up with an opinion from which I am compelled to dissent.

1. The "homes" in the instant case were about the size of a small horse stall, about 10′ by 12′, with no kitchen or lavatory facilities.