Super Smoke N Save LLC v New York State Cannabis Control Bd. (2025 NY Slip Op 25009)

[*1]

Super Smoke N Save LLC v New York State Cannabis Control Bd.

2025 NY Slip Op 25009

Decided on January 13, 2025

Supreme Court, Albany County

Marcelle, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on January 13, 2025
Supreme Court, Albany County

Super Smoke N Save LLC, Two Strains Cannabis Company LLC, 
 Brecken Gold Athletics NYC LLC, Breckenridge Café NYC LLC, and 100 North 3rd LTD D/B/A 7 Leaf Clover, Petitioners,

against
New York State Cannabis Control Board, New York State Office of Cannabis Management, Tremaine Wright, in her official capacity as Chairwoman of the New York State Cannabis Control Board, Felicia Reid, in her official capacity as Interim Executive Director of the New York State Office of Cannabis Management, the New York City Sheriff's Office, and Anthony Miranda, in his official capacity as New York City Sheriff, Respondents.

Index No. 908421-24

MANDELBAUM BARRETT PC, Roseland, NJ (Joshua S. Bauchner, and Jed M. Weiss, of counsel) for Plaintiffs Super Smoke N Save LLC, Two Strains Cannabis Company LLC, Brecken Gold Athletics NYC LLC, Breckenridge Café NYC LLC, and 100 North 3rd Ltd dba 7 Leaf Clover
OFFICE OF THE ATTORNEY GENERAL, Albany, NY (Kaitlin N. Vigars, John F. Moore, and Adrienne J. Kerwin, Asst. Attorney Generals) for Defendants NYS Cannabis Control Board, NYS Office of Cannabis Management, Tremaine Wright, and Felicia Reid
NEW YORK CITY LAW DEPARTMENT, NY, NY (Rachel K. Moston, and Melanie V. Sadok of counsel) for Defendants New York City Sheriff's Office and Anthony Miranda

Thomas Marcelle, J.

In 2021, New York legalized the sale of marijuana—a mind-altering intoxicant which had hitherto been considered a scourge rather than a form of recreation (L 2021, ch 92, Marihuana Regulation and Taxation Act ["MRTA"]). But the drug's sales must be made through state-licensed stores. The legislature created and empowered administrative agencies to regulate the production, manufacturing and transactions of marijuana—to safeguard its consumption and [*2]ensure that the state receives its cut from the sales (MRTA §§ 7,10, 13 [2]; Cannabis Law §§ 2; 9; 11 [5]; 138-a).
Additionally, the legislature amended MRTA to allow local authorities to inspect unlicensed cannabis retailers (Elfand v Adams, 2024 NY Slip Op. 24289 at *2 [New York County, Sup Ct 2024]). The City of New York took the invitation and adopted a local law to permit its Sheriff's Office to "conduct regulatory inspections of any place of business ... where cannabis, [or] cannabis product . . . are sold [and] where no [license] . . . has been issued pursuant to the cannabis law" (Administrative Code of City of NY § 7-552 [a]).
Now, these agencies, as is their charge, began a series of enforcement activities against stores selling marijuana without a license. The problem in this case, at least according to petitioners, is that the enforcement activities targeted not only stores operating outside of the law but also against state-licensed hemp stores.[FN1]

Petitioners are five businesses with Cannabinoid Hemp Retail Licenses. These licensed hemp stores have undergone enforcement activities. They allege that respondents have searched their shops and seized their products in violation of the United States Constitution. Petitioners, therefore, ask the court to grant them injunctive relief. Respondents resist; they say that they are lawfully doing their jobs and are protecting the public and of course the children.
The court held a hearing and has received and reviewed a forest worth of briefs and exhibits from the parties. The court finds as follows.
Super Smoke N Save LLC
Petitioner Super Smoke N Save LLC ("Super Smoke") is located in Saratoga Springs, where it has sold hemp product since 2021 under a valid Cannabinoid Hemp Retail License. According to OCM, "[b]ased on complaints that Super Smoke was possibly selling illicit cannabis, OCM and the Department of Tax and Finance ("DTF") conducted a joint regulatory inspection of the location on June 5, 2024" (NYSCEF No 112 at 11 [emphasis added]). On June 5, 2024, without warning and without a warrant, and with the aid of armed DTF agents and New York State Police (NYSP) troopers, OCM searched Super Smoke's store.
According to OCM, its inspector observed containers of THC-A flower, THC-A concentrate, delta-8 THC concentrate, delta-9 THC edibles, THC-P edibles and concentrate, THC-V Edibles, and THC-B concentrates. OCM alleges that these products were beyond the [*3]scope of Super Smoke's hemp license. This conclusion was reached neither based upon testing nor reviewing the product's required certificates of analysis ("COA"), but rather, upon the OCM investigator's training.[FN2]

As a result, the investigator seized $5,000 to $6,000 worth of products that the investigator deemed unlawful. Additionally, OCM issued Super Smoke a notice of violation and affixed a sticker to the business's front door which proclaimed that illicit cannabis was seized and that OCM was ordering Super Smoke to cease unlicensed activity.
Super Smoke persuasively alleges that OCM seized products based solely on the pictures present on their labels rather than the contents contained therein. Since the raid and seizure, none of the seized products were returned nor was any product testing performed. Finally, it must be noted that Super Smoke alleges that the sticker affixed to its doors has caused a significant decrease in customer traffic and overall sales, sizeable enough to place its continued operation in potential jeopardy.
Brecken Gold Athletics NYC LLC
Petitioner Brecken Gold Athletics NYC LLC ("Brecken Gold") is located in Manhattan and has a valid Hemp License. Additionally, it operates an online storefront for sales of hemp products to customers located outside of New York State—which is perfectly legal. Moreover, it seems the online operation is genuine (and no allegations have been made to the contrary). Unlike certain parts of New York, particularly rural upstate, Manhattan attracts folks from around the country who, while perusing Brecken Gold's products, may be enticed to go online and purchase some goods to have them sent to their residences out-of-state.
Now, OCM says that it received information from local law enforcement that "Brecken Gold was possibly selling illicit cannabis" (NYSCEF No 112 at 13 [emphasis added]). In response, on July 16, 2024, OCM marshalled an array of fifteen to twenty armed law enforcement officers wearing police jackets and bulletproof vests from DTF and the NYSP. Upon entering the store, without warning and without a warrant, the detail confronted a single clerk.
Similar to the Super Smoke operation, OCM seized product it believed was beyond the scope of Brecken Gold's hemp license. It did this despite COAs being directly behind the products on the store shelving (allegedly proving they were all lawful hemp products). However, the OCM inspector failed to examine these certificates; instead, the investigator seized product based on the packaging and labeling.
OCM's search for and seizure of illicit product did not stop there. OCM instructed the Brecken Gold employee to open a locked safe in the store which the employee was unable to do because he did not know the combination. Additionally, OCM explored off retail floor rooms, a basement, and locked cabinets. The OCM inspector seized Brecken Gold's online inventory in locked cabinets below a display case stating, "not for New York sale."
In the basement, the inspector observed multiple hemp edibles packaged in bright yellow, red, and blue colors, with the phrase "muffins" on the front. The packaging, the inspector claimed, was in violation of 9 NYCRR § 114.9(b), which states that "[n]o cannabinoid hemp [*4]products offered for retail sale shall be made attractive to individuals under twenty-one (21) years of age, imitate a candy label, or use cartoons or other images popularly used to advertise to children."
At the close of the search, the OCM inspector affixed an "Illicit Cannabis Seized" notice to the front of Brecken Gold's premises, representing to the public that illicit products were seized, which Brecken Gold alleges amounted to a sales value of $100,000.
Breckenridge Café NYC LLC
Breckenridge Café NYC LLC ("Breckenridge") is a licensed hemp retailer in Brooklyn. Breckenridge has been subject to two searches, one in January 2024 and a second time in September 2024, a month after Breckenridge filed this proceeding.
On the January occasion, OCM inspectors and DTF agents conducted a joint search of Breckenridge. Like the other searches at issue, the members of these regulatory agencies were escorted into the business under guard by NYSP troopers. The troopers were armed with weaponry but not with a warrant.
Again, an agent demanded a Breckenridge employee to open a locked safe in the store. The OCM inspector then descried product in the store that she believed to be cannabis concentrate and cannabis edibles. Thus, these items were seized, but, as OCM alleges, not by one of its inspectors, rather by a DTF agent.
In any event, OCM issued a notice of violation to Breckenridge, affixed a sticker to the front door of Breckenridge warning the public that illicit cannabis had been seized and ordered Breckenridge to cease unlicensed activity. Breckenridge requested an administrative hearing seeking reversal of OCM's determination. The hearing was conducted, and the violations were dismissed.
After losing the hearing, the Sheriff's Office and New York City Police Department ("NYPD") showed up to Breckenridge—again with no warrant. The Sheriff's Office proceeded to search various products and, without performing any testing, threw away product and poured it down a toilet. The Sheriff then provided Breckenridge with an "Order to Cease Unlicensed Activity and Seizure Notice." 
100 North 3rd LTD D/B/A 7 Leaf Clover
100 North 3rd LTD D/B/A 7 Leaf Clover ("7 Leaf Clover") is a hemp dealer located in Brooklyn. The shop has been in business at their Brooklyn location since 2017. 7 Leaf Clover began selling hemp products in 2021 upon obtaining its hemp license from the state.
On June 26, 2024, an undercover police officer with NYPD entered 7 Leaf Clover's premises and stated that an "administrative inspection" was about to occur and, immediately thereafter, approximately sixteen other NYPD officers, including members of the Sheriff's Office, entered the premises. The only other individual at the premises that day was 7 Leaf Clover's manager. The manager asked the cadre of officers if they had a warrant and one of the officers responded that no warrant was needed given the administrative nature of the inspection.
Sheriff deputies opened and searched various employees' personal lockers located in the store without a warrant and with no ostensible basis to believe the lockers contained any illicit items. Deputies also examined 7 Leaf Clover's inventory and questioned the manager about the various products being sold. Apparently, the inspection team was most interested in 7 Leaf Clover's mushroom products. The officers tested products called Amanita Mushrooms, which 7 Leaf Clover was selling legally, for an illegal substance called psilocybin. A deputy performed the tests in store via a portable test kit. The products tested negative for psilocybin. Yet, the [*5]Sheriff's Office ultimately seized the mushroom products anyways, accounting for a cumulative sale value of $35,000.[FN3]

The store manager was also arrested that day and charged with misdemeanor drug possession crimes, despite no product testing positive for the illegal substance during the in-store inspection. The mushroom products seized by the Sheriff that day were tested off site from the store location and the Sheriff's Office claims (without documentation) that some of the products tested positive for psilocybin. However, the misdemeanor charges lodged against the store manager were dismissed for lack of evidence.
Two Strains Cannabis Company LLC
Two Strains Cannabis Company LLC ("Two Strains") is a licensed hemp dealers in Queensbury. It alleges that on June 24, 2024, a search of their business was conducted by the State Police with thousands of dollars of product seized—all done without a warrant. The NYSP are not a named party and the proof adduced at the hearing did not support the involvement of any named respondent in the raid. At most, the State Police called OCM for guidance, but that call in and of itself does not make OCM responsible for initiating the search or the resultant seizure of petitioner's product. Therefore, the court will not address this alleged incident in its analysis and Two Strains' claims will be dismissed.
 Request for Injunctive Relief
Although the parties have presented a number of issues and made a number of motions and cross-motions, the court will only address whether respondents' actions should be enjoined as a likely violation of the Fourth Amendment. It is axiomatic that "[p]reliminary injunctive relief is a drastic remedy [that] is not routinely granted" (Eastview Mall, LLC v Grace Holmes, Inc., 182 AD3d 1057, 1058 [4th Dept 2020]). In particular, a request to stop the government from governing is an exceptional request and demands that a court exercise caution and great discretion (N. Fork Distribution, Inc. v New York State Cannabis Control Bd., 81 Misc 3d 952, 957 [Sup Ct, Albany County 2023]). However, "this does not mean that carte blanche is generously given to governmental authorities without redress or review" (Matter of Lasertron, Inc. v Empire State Dev. Corp., 70 Misc 3d 1085, 1093 [Sup Ct, Erie County 2021]). Rather, "[t]he decision to grant or deny a request for a preliminary injunction is committed to the sound discretion of the trial court" (Biles v Whisher, 160 AD3d 1159, 1160 [3d Dept 2018]).
To guide the court in the exercise of its discretion, CPLR 6301 offers a familiar tripartite test: the party seeking a preliminary injunction must demonstrate (1) a probability of success on the merits (the merits prong), (2) a danger of irreparable injury in the absence of an injunction (the irreparable injury prong) and (3) a balance of equities in its favor (the equity prong) (Camp Bearberry, LLC v Khanna, 212 AD3d 897, 898 [3d Dept 2023]). The court will address each prong in turn.

 Merits Prong
The merits prong starts with a simple fact: OCM's and the Sheriff's Office's searches of petitioners' businesses and the seizure of their products were done without a judicial warrant. Petitioners claim that such warrantless searches violate their right to be free from "unreasonable searches and seizures" (US Const amend IV). Indeed, "searches conducted outside the judicial [*6]process [i.e., warrantless searches,] . . . are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions" (Arizona v Gant, 556 US 332, 338 [2009]).
Now, respondents claim that an exception applies in this case. Namely, respondents say that no warrant is required because their searches and seizures fall under the administrative search exception (New York v Burger, 482 US 691, 703 [1987]). This exception applies to "pervasively regulated businesses" and "closely regulated industries" (Marshall v Barlow's, Inc., 406 US 307, 313 [1978]). This exception is justified because "when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation," and thus, a warrantless search to enforce that regulatory regime is not unreasonable (Marshall, 436 US at 313).
No clearly defined test exists to determine whether a particular business is closely regulated (Hudson Shore Assocs. Ltd. P'ship v New York, 2024 WL 3212689, at *6 [NDNY 2024]). Nevertheless, sales of intoxicants or health products are considered prototypical examples of pervasively regulated businesses (Los Angeles v Patel, 576 US 409, 424 [2015]). Therefore, the court holds, without hesitation, that the sale of hemp and marijuana are closely regulated industries.
The closely regulated industry exception is not self-executing. Rather, it requires the legislature to enact statutes authorizing warrantless administrative searches (Burger, 482 US at 703). A statute is required to animate the administrative exception and an agency regulation will not suffice (see Note, Rethinking Closely Regulated Industries, 129 Harv L Rev 797, 801 [2016]). In this case, the parties hotly debate whether the legislature allowed the Sheriff's Office and OCM to conduct warrantless administrative searches.
Sherriff's Office Statutory Authority
The Sheriff's Office says that the legislature granted them the ability to conduct regulatory inspections. It is true that the legislature did empower local municipalities, upon adoption of a local law, "to conduct regulatory inspections of any place of business located within [the municipality]" to ensure that no unlicensed person unlawfully sells cannabis products—which include both hemp products and marijuana products (Cannabis Law § 131 [3] [a] & [c]). It is also true that the City of New York adopted such a local law under this enabling statute (Administrative Code of City of NY § 7-552 [a]).
However, the legislature limited these inspections. No municipality can conduct regulatory inspections of businesses that appear in the OCM's statutorily mandated directory of licensees (Cannabis Law § 131 [3] [b]). The directory must include all businesses "licensed or registered [by OCM] to engage in retail sales" (Cannabis Law § 11 [13]). Therefore, no question exists that the Sheriff's Office is forbidden to conduct inspections on licensees listed in OCM's directory.
However, the Sheriff's Office takes a cramped construction of the statute's constraints. It argues that Cannabis Law § 131 (3) (b)'s prohibitions on inspections of licensees apply only to those businesses with a marijuana license. Indeed, the Sheriff's Office argues that "it is wholly irrelevant that an entity may also possess a license to sell hemp." There is a problem with this argument—it is contrary to the plain language of the statute. Neither Cannabis Law § 131 (3) (b) nor Cannabis Law § 11 (13) makes a distinction between hemp licensees and marijuana licensees. Accordingly, OCM, as commanded by the statute, maintains a directory for both hemp and marijuana licensees.
The legislature constricted the ability of an authority to search places and seize things—clearly and unambiguously. Therefore, since the legislature did not make distinction between types of licensees, the court will not create one. The judicial power to construe a statute does not encompass the power to amend it (see Sexauer & Lemke v. Burke & Sons Co., 228 NY 341 [1920]). Consequently, the court concludes that businesses that have obtained licenses (either for hemp or for marijuana) are subject to inspections by OCM, but only OCM.
This conclusion is unsurprising. Normally, a licensing agency has the sole power to inspect its licensees—for good reason—the agency has expertise in its field. And so is the case here. As was adduced at the hearing, OCM inspectors are trained on the statutory, scientific, and administrative distinction between hemp and marijuana—sheriff deputies are not. Therefore, under Cannabis Law § 131 (3) (b), the Sheriff's Office lacks any lawful authority to conduct a warrantless regulatory or administrative inspection of any business that possesses either a hemp or marijuana license appearing on OCM's directory.
The directory limitation presents a major problem for the Sheriff's Office. This is because both 7 Leaf Clover and Brecken Gold are licensed by OCM and appear in OCM's directory (Hemp Retail License List 09.23.xlsx, p 84, 31). Accordingly, the Sheriff's Office had no ability to conduct a warrantless administrative search of either 7 Leaf Clover or Brecken Gold.
Without the statutory authority to conduct an administrative inspection, the Sheriff's Office, in order to search petitioners' businesses and seize their products, needed a warrant issued by a judge. In the cases of 7 Leaf Clover and Brecken Gold that never happened. Therefore, the Sheriff's Office violated 7 Leaf Clover's and Brecken Gold's Fourth Amendment right.
One last comment needs to be made before moving to OCM's authority. It appears from the evidence that the vast majority of the Sheriff's Office searches are directed at establishments without any licenses whatsoever. And nothing in this decision stops or prevents the Sheriff's Office from doing the bulk of its work within the confines set by Cannabis Law § 131 (3) (b).[FN4]

OCM's Statutory Authority
Pivoting to OCM, its statutory power is set forth in the Cannabis Law. The legislature has allowed OCM
"To conduct regulatory inspections of any registered, licensed or permitted place of business, where medical cannabis, adult-use cannabis, cannabinoid hemp, hemp extract products, or any products marketed or labeled as such, are cultivated, processed, stored, distributed or sold" (Cannabis Law § 11 [5]).
In addition, the legislature granted OCM significant enforcement powers. It is allowed to:
"order any person who is unlawfully cultivating, processing, distributing or selling cannabis, cannabis product, cannabinoid hemp or hemp extract product, or any product marketed or labeled as such in this state without obtaining the appropriate registration, license, or permit therefor, or engaging in an indirect retail sale to cease such prohibited conduct" (Cannabis Law § 138-a [1]).
Moreover, OCM may:
"seize any cannabis, cannabis product, cannabinoid hemp or hemp extract product, or any product marketed or labeled as such, found in the possession of a person engaged in the conduct described in subdivision one of this section and their place of business . . . " (Cannabis Law § 138-a [2]).
Petitioners argue that the powers granted to OCM under Cannabis Law § 138-a apply only to unlicensed operators. Thus, as the argument goes, since petitioners have hemp licenses, OCM can neither issue orders nor seize contraband, at least under Cannabis Law § 138-a.
The argument rings hollow and is contrary to the statutory language which applies to any person. Indeed, the words of the statute and what those words convey, in context, is what the statute means (Smith v Ryder, 82 Misc 3d 812, 815 [Sup Ct, Albany County 2024]). And where, as here, a statute is unambiguous, the courts must give effect to its plain meaning. Thus, "any person" means any person. Consequently, OCM possess all powers under Cannabis Law § 138-a unless the entity has "obtain[ed] the appropriate registration, license, or permit" for the product it is selling (Cannabis Law § 138-a [1]).
Now, just because the government gives an administrative agency the power to conduct warrantless administrative searches does not mean the administrative searches are therefore always in accord with the Fourth Amendment. No matter the industry, the legislature may not give the executive branch the power to ignore the Constitution (People v Rizzo, 40 NY2d 425, 428 [1976]). Thus, just because an exception to the warrant requirement exists, this does not mean the government's search may proceed without bounds.
As the administrative state has mushroomed, so too have regulations, thus making much of the stream of commerce closely regulated. Administrative searches, if not limited, could affect a large number of people and places. So, to stop inspectors from running amok and from crossing constitutional barriers, the Supreme Court has erected hurdles before the government can circumvent the Fourth Amendment's warrant requirement:
"(1) there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant" (City of Los Angeles v Patel, 576 US 409, 432 [2015] [Scalia, J. dissenting, quoting the test set forth in New York v Burger, 482 US 691, 702—703 [1987]).
This "test is a carefully-drawn screen that we—and all courts—must jealously protect, lest this particular warrantless-search exception destroy the Fourth Amendment" (Rivera-Corraliza v Morales, 794 F3d 208, 217 [1st Cir 2015]). With this strict examination in mind, the court will review OCM's searches of petitioners' businesses.
The real conflict in this case, in the court's view, is whether OCM's searches of petitioners' businesses and products aligns with the third prong of the warrantless administrative search test. Therefore, for the purposes of this opinion, the court will momentarily presume that the first two prongs are satisfied.
The third prong of the test ensures that the warrantless searches are "properly defined [in] scope and . . . limit the discretion of the inspecting officers" (Burger, 482 US at 702). In defining how a statute limits the discretion of the inspectors . . . it must be "carefully limited in time, place, and scope" (id). Indeed, no government "may require, as a condition of doing business, a blanket submission to warrantless searches at any time and for any purpose" (Finn's [*7]Liquor Shop, Inc. v State Liquor Auth., 24 NY2d 647, 658 [1969]).
The glaring problem with the administration searches here is the absence of any statutory boundaries. Cannabis Law § 138-1 (1) & (2) place none of the required constitutional safeguards on OCM. Nothing in the statute limits the scope or timing of the search nor the discretion of OCM officers. Further, OCM cites no regulation that circumscribes and contains its power to conduct warrantless searches.
This makes OCM's warrantless administrative search regime stand in stark contrast to the limits that the legislature placed upon the local municipalities conducting regulatory searches (see Cannabis Law § 131 [3] [d] [i] [requiring local governments to adopt "procedures sufficient to ensure that any regulatory inspections are conducted in a reasonable manner, are administrative in nature, designed to detect administrative violations, in furtherance of the regulatory scheme established pursuant to this section, and designed to guarantee certainty and regularity of application"]). It also compares unfavorably to New York's administrative searches which the Supreme Court upheld (see Burger, 482 US at 711-712 [holding that administrative inspection under Vehicle and Traffic Law § 415-a [5] imposed "sufficient time, place, and scope restraints . . . upon the discretion of the inspecting officers [by allowing] inspections only during regular and usual business hours[; by allowing] inspections . . . only of vehicle-dismantling and related industries [; and by narrowly defining] the permissible scope of these searches"]).[FN5]

There is simply no way around this statutory defect. The Supreme Court has told governments that seek to conduct warrantless searches that they must place statutory limits on the administrative agents who seek out contraband without a warrant—this has not been done. The court, therefore, believes it highly probable that petitioners will succeed on the merits of their claim that OCM violated their rights secured by the Fourth Amendment. Consequently, petitioners have established the merits prong.
Moreover, and alternatively, even if the court were inclined to believe respondents had the power to conduct warrantless searches, the search and how it is performed must still comport with the Fourth Amendment. As the Supreme Court has admonished, "[e]ven if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution" (Maryland v King, 569 US 435, 448 [2013] [emphasis added]). "To meet the test of reasonableness [in] the administrative search [context], the search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it" (Bruce v Beary, 498 F3d 1232, 1248 [11th Cir 2007]). In short, while the Constitution okays warrantless searches in some situations, it never gives the go ahead to unreasonable ones. Here, the searches' purpose and their manner of execution seem deeply removed from any reasonable administrative search.
To begin, the purposes of the searches related not to compliance with licensure but [*8]discovery of contraband. While the subjective purpose for conducting a search or seizure is generally irrelevant to the search or seizure's constitutionality, it is not always so. "In the context of an administrative search, the purposes (and therefore scope) of the search are indeed relevant" (Anobile v Pelligrino, 303 F3d 107, 122 [2d Cir 2002]; see also United States v Grey, 959 F3d 1166, 1183 [9th Cir 2020] [noting that "actual motives do matter" in administrative searches]). On the present early and incomplete record, the court is preliminarily convinced that the purpose of respondents' inspections was to discover illicit contraband, not to obtain evidence of regulatory violations—the proof on this point, in the court's estimation, is beyond question.
The manner of the searches' execution is damning. In all instances respondents were accompanied by heavily armed law enforcement officers who ordered customers out of the stores and prevented anyone from entering, permitting no commercial transactions to happen. In addition, armed revenue agents crowded into the stores. Although respondents claim that the armed contingent was necessary for safety, no evidence of any specific instances was ever cited where hemp store employees or customers endangered or attempted to endanger the safety of regulators.[FN6]

Rather, the court infers that the presence of so many officers with weapons was to intimidate and to compel employees and customers into compliance with respondents' orders. Additionally, the presence of armed tax agents inside retail operations was revealing. Such agents have no training nor mandate for ensuring that licensees were meeting regulatory rules. Rather, the tax department interest is singular—making sure petitioners were not evading taxes by purveying contraband.
Respondents' use of implied force is not the only evidence that raises the specter of a search beyond administrative purposes. Significantly, either respondents or their armed associates turned off surveillance cameras before the searches—an obvious purpose being to hide their activities.[FN7]

Further, respondents' searches were not confined to the sales floors or open and obvious places where products would be routinely housed and available for purchase, but spanned offices, locked cabinets, safes, personal lockers and even basements—indeed, there appeared to be no regard for boundaries in these inspections.
Perhaps, most revealing is what respondents did not do. Respondents omitted what would seem an essential step in conducting a regulatory inspection—inspect the products. Many products contained the OCM's mandated Certificates of Analysis (COA). The COAs of the seized products showed that the products were presumptively lawful. But respondents never used the QR codes to check for compliance. Additionally, respondents performed no onsite [*9]testing of any of the products in question.[FN8]
Shockingly, the Sheriff's Office destroyed the product upon seizure so no testing could ever be conducted. This willful ignorance as to the nature of the products exposes a search that is not administrative in nature.
Another telling indicator of unreasonableness was respondents' seizure of obviously lawful products. Agents seized products that were designed and designated for interstate commerce and not for sale and stored in basements or locked cabinets. Such interstate products that were not for sale in this state were beyond respondents' lawful reach to seize. Also, respondents seized cannabis muffins simply because the packaging was adorned with bright colors, preposterously claiming that it amounted to advertising aimed at children.
Finally, it is always wise to remember history to give context and understanding to governmental efforts to find contraband. The government search for and seizure of contraband sold outside state approved channels is a conflict as old as our Nation. Indeed, before securing our glorious independence from England, royal customs officers employed writs of assistance to search and seize untaxed contraband.
Customs officers obtained writs of assistance as accessories to their commissions, without alleging illegal activity as a precondition for them, without judicial superintendence, and without the possibility of refusal (Maclin, The Complexity of the Fourth Amendment: A Historical Review, 77 BU L Rev 925, 939 [1997]). The writ empowered customs officers to search wherever they suspected uncustomed goods to be, and to break open any receptacle or package falling under their suspecting eye (id). Indeed, "[o]pposition to such searches was in fact one of the driving forces behind the Revolution itself (Riley v California, 573 US 373, 403 [2014]).
This history is relevant. First, "statutes authorizing administrative searches are [the modern] equivalent of colonial writs of assistance" (People v Scott, 79 NY2d 474, 497 [1992]). And second, it provides guidance on the broad values that underlie the Constitution. As then Judge Rowan sharply noted:
"The Fourth Amendment to the U.S. Constitution . . . reflects the American consensus that the general warrants and writs of assistance popular among British officials in colonial government—orders that licensed their possessors to scour homes and businesses . . . had no place in a nascent republic that so deeply abhorred arbitrary power" (In re 381 Search Warrants Directed to Facebook, Inc., 29 NY3d 231, 256 [2017] [Rowan, J. dissenting]).
Just so.
In sum, how respondents conducted their enforcement activities against petitioners was a far cry from an administrative inspection seeking to cull evidence of regulatory violations. The court often hears cases, like those from Agriculture and Markets, involving state inspectors inspecting businesses—there, regulators come armed with clipboards, forms and pens, and not guns, bulletproof vests and handcuffs.
To put a fine point on it, the searches of petitioners' stores and the seizure of their products, no matter the justification, were unreasonable. Therefore, the court concludes that [*10]petitioners are likely to prove that respondents violated petitioners' Fourth Amendment rights. Thus, petitioners have established the merits prong of the preliminary injunction test.

Irreparable Injury Prong
The court will turn to the second prong, the irreparable injury prong. Now, this case involves a potential violation of petitioners' constitutional rights. When the government inflicts a constitutional injury on its citizens, the injury is grave and demands immediate rectification (Melody v Goodrich, 67 AD 368 [3d Dept 1901]). As a result, "a presumption of irreparable injury flows from a violation of constitutional rights (Agudath Isr. of Am. v Cuomo, 983 F3d 620, 636 [2d Cir 2020]). Here, since petitioners are highly likely to establish a violation of their Fourth Amendment rights, they have satisfied the requirement that they show irreparable injury.

Equity Prong
The last injunctive prong reflects the demand of equity. Accordingly, this prong requires petitioners to demonstrate that the balance of the equities tips in their favor. But once the injunctive test has proceeded to this ultimate prong, the determination of equities does not occur in a vacuum. Rather, where the movant, as petitioners have done here, satisfies both the merits and irreparable injury prongs, the balance of the equities always tips in the movant's favor absent some greater hardship that the nonmovant would suffer should the injunction issue (see N. Fork Distribution, Inc.., 81 Misc 3d at 964).
Respondents offer legitimate concerns should an injunction be granted. They accurately say that unlicensed sale and unregulated cannabis products are a threat to the public health—of that there is no doubt. The court fully grasps that such products pose a threat and accepts respondents' salient mission to ensure that such products are safely consumed.
This problem is large. As the Sheriff's Office notes, there are 3,600 unlicensed cannabis retailers alone within the City of New York operating in flagrant violation of the law. Although nowhere do respondents attempt to inform the court what percentage of these black-market shops are licensed hemp shops, this omission suggests, at least by way of inference, that the percentage is small.
There is another pressing circumstance respondents cite. According to the Sheriff's Office, children are at particular risk. It says that many unlicensed retail establishments are proximate to schools and public youth facilities and that children are drawn into purchasing THC-infused edibles. Additionally, such cannabis products are typically produced by unregulated, unlicensed manufacturers and could contain harmful additives and/or contaminants, as well as unpredictable amounts of THC.
These concerns are valid. Ultimately, the deprivation of petitioners' constitutional rights (as well as those similarly situated) must be balanced against respondents' interest in conducting warrantless search to interdict illicit marijuana at hemp shops. In conducting this balance, the court is mindful of Judge Titone's eloquent reminder of a judge's responsibility in warrantless search cases:
"Our responsibility in the judicial branch is not to respond to these temporary crises or to shape the law so as to advance the goals of law enforcement, but rather to stand as a fixed citadel for constitutional rights, safeguarding them against those who would dismantle our system of ordered liberty in favor of a system of well-kept order alone. As has recently been observed, the present crisis will, undoubtedly, abate, but the precedents we create now will long endure" (Scott, 79 NY2d at 501).
What tips the balance is that nothing that petitioners seek in the way of relief would [*11]interfere with enforcing the law. Respondents simply must do so in a constitutional manner and not through unreasonable warrantless searches. Therefore, the court concludes that the balance of the equities tips in petitioners' favor.
Petitioners having prevailed on all three prongs of the preliminary injunction test, it is incumbent upon the court to fashion an equitable remedy in the exercise of its discretion (People by James v Nat'l Rifle Ass'n of Am., 222 AD3d 498, 1 [1st Dept 2023]).
Accordingly, it is:
Ordered that Respondent New York City Sheriff's Office is enjoined from conducting warrantless searches of businesses that appear on the New York State Office of Cannabis Management directory of Cannabinoid Hemp Retail Licenses which the New York State Office of Cannabis Management is required to maintain pursuant to Cannabis Law § 11 (13); and it is further
Ordered that Respondent New York City Sheriff's Office immediately and without any delay remove all Notice of Violation signs that it placed, ordered to have placed or caused to have placed on any doors, windows or any other part of the premises belonging to Petitioners 100 NORTH 3RD LTD D/B/A 7 LEAF CLOVER and BRECKENRIDGE CAFÉ NYC LLC; and it is further
Ordered that Respondent New York City Sheriff's Office shall forthwith return any and all items seized or taken from Petitioners 100 NORTH 3RD LTD D/B/A 7 LEAF CLOVER and BRECKENRIDGE CAFÉ NYC LLC unless an item is illegal to 
possess by any person under any circumstances [FN9]
provided that Respondent New York City Sheriff's Office serves notice upon Petitioners 100 NORTH 3RD LTD D/B/A 7 LEAF CLOVER and BRECKENRIDGE CAFÉ NYC LLC and files with the Court within seven (7) days of this Order that a retained item seized is illegal to possess by any person under any circumstances as demonstrated by a sworn affidavit detailing precisely and particularly on what grounds such item or items are illegal to possess; and it is further
Ordered that Respondent NEW YORK STATE CANNABIS CONTROL BOARD and Respondent NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT are enjoined from conducting warrantless searches of petitioners' businesses; and it is further
Ordered that Respondent NEW YORK STATE CANNABIS CONTROL BOARD and Respondent NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT are enjoined from seizing petitioners' products or any item unless a particular product contains unlawful levels of intoxicants verified by testing, or as shown by a certificate of analysis, or if a particular product has no certificate of analysis whatsoever, or the item or product is unlawful for any person to possess under any circumstance; and it is further
Ordered that Respondent NEW YORK STATE CANNABIS CONTROL BOARD and Respondent NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT may conduct reasonable regulatory inspections of retail store space with no more than two inspectors whom shall not be armed unless Respondent NEW YORK STATE CANNABIS CONTROL BOARD or Respondent NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT have a specific credible documented security concern associated with the particular business that they are [*12]inspecting; and it is further
Ordered that Respondent NEW YORK STATE CANNABIS CONTROL BOARD or Respondent NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT immediately and without any delay remove all Notice of Violation signs that it placed, ordered to have placed or caused to have placed on any doors, windows or on any part of the premises belonging to Petitioners SUPER SMOKE N SAVE LLC, COMPANY LLC, BRECKEN GOLD ATHLETICS NYC LLC, and BRECKENRIDGE CAFÉ NYC LLC; and it is further
Ordered that Respondent NEW YORK STATE CANNABIS CONTROL BOARD or Respondent NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT shall forthwith return any and all items seized or taken from Petitioners SUPER SMOKE N SAVE LLC, BRECKEN GOLD ATHLETICS NYC LLC, and BRECKENRIDGE CAFÉ NYC LLC unless an item is illegal to 
possess by any person under any circumstances [FN10]
provided that Respondent NEW YORK STATE CANNABIS CONTROL BOARD or Respondent NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT serve notice upon Petitioners SUPER SMOKE N SAVE LLC, BRECKEN GOLD ATHLETICS NYC LLC, and BRECKENRIDGE CAFÉ NYC LLC and file with the Court within seven (7) days of this Order that a retained item seized is illegal to possess by any person under any circumstances as demonstrated by a sworn affidavit detailing precisely and particularly on what grounds such item or items are illegal to possess; and it is further
Ordered, that the court reserves on respondents' pending motions and will render decision in due course except that Two Strains Cannabis Company LLC's claims are dismissed for the reasons noted above.
The foregoing constitutes the Decision and Order of the court.
DATED: January 13, 2025
Thomas Marcelle
Supreme Court Justice

Footnotes

Footnote 1:The opinion uses the terms marijuana and hemp. They both come from the same plant (Cannabis) but are not the same thing. Cannabis sativa is the botanical name for the plant, and it contains a host of compounds called cannabinoids, two of which are particularly relevant to this case. First is tetrahydrocannabinol (THC). THC, when consumed, binds to the CB1 receptors of the brain, causing the release of neurotransmitters like dopamine that may create a feeling of relaxation and euphoria. THC, in a sufficient amount, intoxicates those who consume it. New York terms cannabis with high levels of THC "adult-use cannabis," which in common parlance is known as marijuana. The second compound is cannabidiol (CBD). CBD purports to offer any number of medicinal benefits but is perhaps most widely employed for its anti-inflammatory and analgesic properties. Hemp products allow the consumption of CBD by application or ingestion of various tinctures, oils, topicals, pills, capsules and foods or beverages. Hemp contains THC but in a "concentration of not more than 0.3 percent on a dry weight basis" (7 USC § 1639 o [1])—so, unlike marijuana, hemp products are generally not intoxicants.

Footnote 2:Additionally, an OCM inspector observed CBD edibles and gummies that exceeded the maximum limit for THC content on a per package basis and per serving basis and exceeded the maximum THC to CBD ratio required for cannabinoid hemp products.

Footnote 3:The Sheriff's Office claims that it scanned the QR codes contained on certain products, however the evidence offered at the hearing did not establish this claim.

Footnote 4:Not before the court is the legislature's ability to authorize "regulatory inspections" of persons and businesses who do not possess licenses and who are not subject to regulations. Accordingly, the court will not address it.

Footnote 5:Petitioners' case would be even stronger if they had asserted their rights under article I, § 12 of our State Constitution. The Court of Appeals subsequent to Burger found that Vehicle and Traffic Law § 415-a (5) violated New York's proscription against unreasonable searches and seizures because the statute insufficiently provided "either a meaningful limitation on the otherwise unlimited discretion the statute affords or a satisfactory means to minimize the risk of arbitrary and/or abusive enforcement" (People v Scott, 79 NY2d 474, 492 [1992]).

Footnote 6:The court is slightly suspect of this assertion. Hemp store employees and customers are not reputed for dangerousness and viciousness—to the contrary, their reputation, if any, is one of passivity and mellowness. 

Footnote 7:The court, in its criminal part, is familiar with how narcotics detectives oftentimes disable cameras when entering drug and trap houses—they do this, as the detectives have testified, because it protects their operational methods and tactics from being disclosed and studied.

Footnote 8:The only evidence of onsite testing being performed was in the case of the Sheriff's Office at 7 Leaf Clover's establishment testing mushrooms, not cannabis products, for the illegal substance psilocybin.

Footnote 9:The phrase "any person under any circumstances" does not include the circumstance where a government official possesses a contraband item in the course of exercising his official duties.

Footnote 10:The phrase "any person under any circumstances" does not include the circumstance where a government official possesses a contraband item in the course of exercising his official duties.